## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Toyota Motor Sales, U.S.A., Inc., | Case No. 22-cv-1681 (KMM/JFD) |
| Plaintiff, | |
| v. | **ORDER** |
| Allen Interchange LLC, et al., | |
| Defendant, | |
| Allen Interchange LLC, | |
| Counter Claimant, | |
| v. | |
| Toyota Motor Sales, U.S.A., Inc., | |
| Counter Defendant. | |

This matter is before the Court on Counter Defendant Toyota Motor Sales, U.S.A., Inc.'s, ("Toyota USA") Motion to Dismiss Counter Claimant Allen Interchange LLC's ("Allen Interchange") counterclaims.[1]  Toyota USA argues that Allen Interchange's counterclaims fail as a matter of law.  For the reasons stated below, the Court denies the motion to dismiss.

---

[1] Toyota USA Motion to Dismiss, ECF No. 33; Allen Interchange Answer and Counterclaim ("Counterclaim"), ECF No. 15.

I.    **Background**[2]

Toyota USA is a subsidiary of Toyota Motor Corporation ("Toyota Japan"). [Countercl. ¶ 94.]  This case centers around Allen Interchange's distribution of Toyota replacement parts.  [*Id.* ¶¶ 97–102.]  The parts at issue are manufactured by authorized suppliers from around the world according to Toyota Japan's designs, specifications, and quality standards.  [*Id.* ¶ 99.]

Toyota USA sells vehicles and parts to its dealers and uses a standard dealer agreement to govern its relationship with those dealers ("Toyota Dealer Agreement").  [*Id.* ¶ 108.]  Most parts in Toyota vehicles that require replacing do not have aftermarket substitutes manufactured by an independent third party.  [*Id.* ¶ 100.]  Toyota dealers sell Toyota vehicles, provide repair and maintenance services for Toyota vehicles, and may sell Toyota vehicle parts to owners.  [*Id.* ¶¶ 101, 108.]

Allen Interchange competes with Toyota USA for sales of Toyota parts in the United States.  [*Id.* ¶¶ 97, 102, 106.]  According to Allen Interchange, Toyota USA "sells Toyota Parts in the United States at prices substantially higher than those charged by Toyota in other places."  [*Id.* ¶ 106.]  Allen Interchange buys Toyota parts injected into the stream of commerce by Toyota through an initial sale outside the United States and resells them to Toyota dealers and others in the United States at lower prices.  [*Id.*]  The Toyota parts sold

---

[2] This statement of facts is taken from Allen Interchange's Answer and Counterclaim, and, when relevant, from Toyota USA's Amended Complaint.  As explained below, the Court must take the allegations in Allen Interchange's Answer and Counterclaim as true for the purposes of considering Toyota USA's motion to dismiss.

by Allen Interchange and Toyota bear the same part number, and according to Allen Interchange, are identical in design, function, and quality.  [*Id.* ¶ 103.]

Toyota USA brought various causes of actions against Allen Interchange due to the above-mentioned business practice invoking the Lanham Act and other claims.   The general basis for Toyota USA's allegations is that Allen Interchange is a gray market parts supplier, importing and selling Toyota-branded vehicle replacement parts in the United States even though the parts are intended for sale or use outside of the United States. [Am. Compl. ¶¶ 17, 36, 37, ECF 5.]  Toyota USA asserts that the Toyota-branded parts sold by Allen Interchange have material differences from the "Genuine" parts it sells, including: the existence of a manufacturer-backed warranty, the shipping and packaging of the parts, and the appearance and condition of the parts.  [*Id.* ¶¶ 41–43, 49, 60.]

Allen Interchange responded to Toyota USA's Amended Complaint by denying infringement of Toyota USA's alleged trademark rights.  Allen Interchange also asserted eight counterclaims: Unfair Competition (Count 1); Tortious Interference with Prospective Economic Advantage (Count 2); Minnesota Deceptive Trade Practices Act Violation (Count 3); Monopolization or Attempted Monopolization (Count 4); Antitrust Violation – Naked Restraint of Trade (Count 5); Antitrust Violation – Tying Arrangement (Count 6); Minnesota Law Antitrust Violations (Count 7); and Unjust Enrichment (Count 8).  These counterclaims arise from Toyota USA's alleged anticompetitive conduct in attempting to prevent authorized Toyota dealers from purchasing and reselling parts from Allen Interchange.

## II.   Discussion

### A.  Standard of Review

To survive a motion to dismiss, a counterclaim must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court takes the facts in Allen Interchange's counterclaims as true for the purposes of this motion, but does not extend the same presumption to the allegations in Toyota USA's Amended Complaint.  *Wi2Wi, Inc. v. Twin City Fire Ins. Co.*, No. 19-cv-06995-BLF, 2020 WL 4913489, at *4 (N.D. Cal. May 5, 2020) (explaining that "the court must accept all factual allegations in the counterclaims as true," and "the allegations in the original complaint are not entitled to the presumption of truth") (quotation omitted).  Although a counterclaim need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  *Id.* at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

Toyota USA moves for dismissal of each of Allen Interchange's counterclaims, raising numerous challenges.  The Court will consider each in turn.

### B.  Antitrust Counterclaims

Allen Interchange brings four antitrust counterclaims: Count 4 - Monopolization or Attempted Monopolization; Count 5 – Naked Restraint of Trade; Count 6 – Tying Arrangement; Count 7 – Minnesota Law Antitrust Violations.  Toyota USA argues that Allen Interchange's antitrust counterclaims fail as a matter of law.  The Court will first

4

address three overarching challenges raised by Toyota USA as to all four of these related counterclaims, and then will turn to additional arguments made in support of dismissal of the individual antitrust counterclaims.

### 1.  Overarching Antitrust Issues

Toyota USA argues that three big-picture flaws infect all of Allen Interchange's antitrust counterclaims: (1) Toyota USA is allowed to "monopolize its own brand," (2) the counterclaims fail to identify a relevant product market, and (3) there is no alleged antitrust injury.   The Court discusses each argument below, and concludes that none requires dismissal of the antitrust counterclaims.

### *Ability to Monopolize Brand*

Toyota USA first argues that a company cannot be charged with antitrust violations if it "monopolizes its own brand."  [Toyota Mem. in Supp. 14 (citing *Int'l Logistics Grp., Ltd. v. Chrysler Corp.*, 884 F.2d 904, 908 (6th Cir. 1989)), ECF No. 35.]  It is generally true that a manufacturer can monopolize its own brand without running afoul of the law. *See, e.g.*, *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1282 (10th Cir. 2004) ("[A] company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product.") (quoting *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992)).   But this general proclamation doesn't immunize Toyota USA's conduct as broadly as it suggests.

The Supreme Court has found that, in some situations, monopolization of a single brand can constitute an antitrust violation.  *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481–82 (1992) (rejecting Kodak's argument that "as a matter of

law, a single brand of a product or service can never be a relevant market"). In *Kodak*, a group of independent businesses who serviced Kodak copying and micrographic equipment asserted antitrust claims against Kodak. 504 U.S. at 454–58. They challenged a Kodak policy of selling replacement parts only to buyers of Kodak equipment who did not use third parties for repairs. *Id.* at 458. The Court found that respondents presented evidence that "Kodak took exclusionary action to maintain its parts monopoly," and explained that liability turned on whether the facts proved that "'valid business reasons' can explain Kodak's actions." *Id.* at 483. Among other important takeaways from *Kodak* is the certainty that a company's right to engage in conduct that could be anticompetitive is not necessarily beyond the reach of the Sherman Act simply because it involves that company's own brands.

Toyota points to *Chrysler*, 884 F.2d at 908, and *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919), but neither immunize Toyota's conduct. In *Chrysler*, Chrysler sought to restrict the plaintiff from reselling products obtained from abroad to domestic "Chrysler dealers at prices substantially below Chrysler's prices to its domestic dealers." *Chrysler*, 884 F.2d at 906. In affirming the trial court's finding in favor of Chrysler, the Sixth Circuit noted that Chrysler could have unilaterally required its franchised dealers to purchase their parts exclusively from Chrysler and not be charged with restraining trade. *Id.* at 908. But, the Sixth Circuit has since recognized that *Kodak* effectively overruled the *Chrysler* holding about monopolization of a single brand. *See Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 613–15 (6th Cir. 1993) (analyzing *Chrysler* and *Kodak*

to conclude, based on *Kodak*, that "[c]learly, one brand of a product can constitute the relevant market").

*Colgate* is unhelpful to Toyota for a different reason. In *Colgate*, the issue was whether manufacturers are prohibited from barring dealers from reselling the manufacturers' products. 250 U.S. at 307. The Court was considering what limits a manufacturer can place on the sales or prices of its own goods. This case does not present a similar situation. Here, Allen Interchange's antitrust counterclaims are not based on Toyota USA's refusal to sell to Allen Interchange or on what Toyota USA requires of Toyota dealers with respect to products the dealers buy from Toyota USA. Instead, the issue raised by the counterclaims is Toyota's alleged attempts to prevent its dealers from buying products for non-warranty repairs from anyone but Toyota USA. As a result, *Colgate* is not instructive.

Other cases specifically dealing with automakers and dealers confirm that monopoly allegations involving a single brand can constitute antitrust violations in certain situations. For instance, the Fourth Circuit upheld a jury award finding that a Mercedes distributor violated antitrust laws by requiring dealers to buy Mercedes-Benz replacement parts only from the distributor. *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 828 F.2d 1033, 1035–36 (4th Cir. 1987); *see also Ford Motor Co. v. GMB Universal Joints (West), Inc.*, No. 86-6502, 7-5800, 1988 WL 82826, at *3 (9th Cir. 1988) (unpublished table decision) (reversing district court's grant of summary judgment in Ford's favor on claim it unlawfully tied purchases of automobiles and replacements parts in its dealership contracts

and noting that "[e]ven if the agreement covered only warranty parts, it would not automatically be exempt from tying analysis").

This authority undermines Toyota's first broad antitrust argument. Here, Allen Interchange alleges that Toyota USA either unlawfully prohibited dealers from buying Toyota replacement parts for non-warranty repairs, or led dealers to believe they were prohibited from doing so. Of course, Toyota USA may ultimately be able to show that its handling of its own brand was lawful. But, Allen Interchange has properly alleged that Toyota USA monopolized its brand in a way that, if proven, could constitute an antitrust violation. Because at this stage of the litigation the court must accept as true Allen's allegations, the Court rejects Toyota USA's assertion that is essentially immune from allegations of anticompetitive conduct.

### *Relevant Product Market*

Toyota USA next asserts that Allen Interchange's antitrust counterclaims "fail[] to allege a legally sufficient relevant market." [Toyota Mem. in Supp. 15.] It is true that to state a viable claim under the Sherman Act, Allen Interchange must identify a valid relevant market. *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1125 (D. Minn. 2016) (citing *Double D. Spotting Serv. Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998)). A relevant market includes "both a product market and a geographic market." *Id.* "The relevant product market includes all reasonably interchangeable products. The geographic market is defined by considering the commercial realities faced by consumers. It includes the geographic area in which

consumers can practically seek alternative services of product." *Id.* (quoting *Double D. Spotting Serv. Inc.*, 136 F.3d at 560).

Courts are generally reluctant to grant a motion to dismiss based on the contours of the relevant market due to the fact-intensive inquiry that is necessary. *Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1075 (S.D. Iowa 2017) ("Questions of market definition are rather fact-intensive and generally inappropriate for resolution on a motion to dismiss."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2nd Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant market."); *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.")  That said, there is not "a per se prohibition against dismissal of antitrust claims for failure to plead a relevant market." *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 885 (D. Minn. 2017) (quoting *Queen City Pizza, Inc. v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997)).

Even recognizing that dismissal of antitrust claims at the pleading stage is possible for an inadequately defined market, the Court declines to order such dismissal here.  "The types of pleadings that fail to allege a plausible relevant product market generally fail because the pleading . . . attempts to limit the relevant market with respect to 'a single brand, franchise, institution, or comparable entity that competes with potential substitutes' . . . ." *Mahaska Bottling Co.*, 271 F. Supp. 3d at 1075 (quoting *Todd*, 275 F.3d at 200). However, here Allen Interchange defines the product market as "the dealer market for Toyota Captive Parts for Non-Warranty Repairs," and the geographic market as "Toyota's

Primary Market Area." [Countercl. ¶ 165.] Allen Interchange wants to sell *Toyota-branded* replacement parts to dealers and argues that Toyota USA improperly restricts its ability to do so. As discussed above, *Kodak* makes it possible for a single brand of a product to constitute a relevant market in certain situations. 504 U.S. at 481. The Court finds that Allen Interchange has sufficiently alleged a relevant market to withstand a motion to dismiss.

### Antitrust Injury

Toyota USA next asserts that all of Allen Interchange's antitrust claims must be dismissed because Allen Interchange does not describe an actionable antitrust injury. [Toyota Mem. in Supp. 27.] Once again, the Court disagrees.

"[A]ntitrust injury is a threshold issue that plaintiffs must establish in order to have standing to sue under the antitrust laws." *Fischer v. NWA, Inc.*, 883 F.2d 594, 597 n.5 (8th Cir. 1989). "The injury should reflect the anticompetitive effect of either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A plaintiff suffers a sufficient antitrust injury when it is "the target of the anticompetitive activity," rather than "one who has merely suffered indirect, secondary, or remote injury." *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985) (quotation omitted). There is a low threshold for antitrust injury at the pleading stage. *See Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 645 F. Supp. 2d 734, 748–49 (D. Minn. 2009) (stating that although the plaintiffs' allegations that it "has been injured in its business and property" due to the defendants' antitrust violations were

sufficient to survive a motion for judgment on the pleadings, more was needed at the summary judgment stage).

In its counterclaim, Allen Interchange has pled sufficient facts to allege that it was injured by Toyota USA's alleged anticompetitive conduct. Specifically, Allen Interchange claims that: (1) it is an actual competitor of Toyota USA; (2) Toyota's anticompetitive and misleading conduct has caused Allen Interchange's customers to stop buying Toyota parts from it; and (3) because of Toyota USA's efforts to stifle competition, Allen Interchange has lost sales and goodwill and is at risk of being driven from the market entirely. [Countercl. ¶¶ 3, 102, 106–07, 134.] This is enough. *See Inline Packaging*, 164 F. Supp. 3d at 1135–36 (finding direct injury pled by allegation of lost profits as a result of lost sales attributable to anticompetitive conduct). Allen Interchange has likewise sufficiently alleged "injury to competition." *See Chicago Studio Rental, Inc. v. Ill. Dep't of Com.*, 940 F.3d 971, 978 (7th Cir. 2019) ("The alleged injury must either reduce output or raise prices to consumers."). Allen Interchange specifically asserts that Toyota USA's "conduct, activities, and practice restrain competition and impact prices customers pay for Toyota Parts." [Countercl. ¶ 163.]

The Court is not persuaded by Toyota USA's reliance on *W. Goebel Porzellanfabrik v. Action Industries Inc.*, 589 F. Supp. 763 (S.D.N.Y. 1984). In *Goebel*, the alleged injury was that a manufacturer "us[ed] its copyrights to limit the quantity of Hummel figures being imported into this country, thereby keeping prices artifically [sic] high." *Id.* at 763. There the antitrust claimant lacked standing for its antitrust claims because the only direct loss it could point to was that it had been "forced to stop importing" the figures because of

11

the manufacturer's infringement claims.  *Id.* at 766.  Additionally, the court found that because the claimant had unilaterally stopped importing, its injury was "strictly self-inflicted," and therefore, the manufacturer could not be held liable for any loss the claimant incurred because of its own decision to cease imports.  *Id.*

Unlike the plaintiff in *Goebel*, Allen Interchange is not alleging claims against the manufacturer, Toyota Japan.  Instead, it is asserting claims against its alleged direct competitor, Toyota USA, based on Toyota USA's unlawful anticompetitive conduct.  Moreover, none of Allen Interchange's claimed injuries can be described as self-inflicted.  Rather Allen Interchange alleges that its customers stopped doing business with Allen Interchange only after Toyota USA coerced them to do so.  Therefore, accepting the allegations in the Counterclaims as true, *Goebel* provides little guidance.  As noted by the *Fair Isaac Corp.* court, 645 F. Supp. 2d at 748–49, Allen Interchange will need to demonstrate actual antitrust injury later in the litigation, but for now, its allegations are sufficient to survive Toyota USA's motion to dismiss.

### 2.  Individual Antitrust Counterclaims

The Court now turns to Toyota USA's challenges to the individual antitrust counterclaims.  As the Court explains below, none of these arguments carry the day.  Indeed, many of Toyota USA's challenges to Allen Interchange's counterclaims fail because they turn the appropriate legal standard on its head.  At this stage and for this motion, the Court accepts Allen Interchange's factual allegations as true.  But many of Toyota USA's arguments in favor of dismissal invite the Court to do the opposite and accept as true Toyota USA's narrative.  While it will be essential at some point in this

12

litigation to assess and weigh the competing facts, such a consideration is not proper at this stage. A close examination of Toyota USA's arguments using the proper lens reflects that none require dismissal.

### Count 4: 15 U.S.C. § 2 Monopolization or Attempted Monopolization

In Count 4 of its Counterclaim, Allen Interchange asserts claims of monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, 15. U.S.C. § 2. Specifically, Allen argues that Toyota has monopolized or attempted to monopolize the market for Toyota captive parts for non-warranty repairs. [Countercl. ¶ 165.] In its motion to dismiss, Toyota USA alleges that Allen Interchange has not sufficiently alleged a monopolization or alleged monopolization claim because a manufacturer is permitted to monopolize its brand and its business dealings and communications, which mandate against the purchase of "gray market parts," advance various legitimate purposes outside of a strict desire to limit competition. [Toyota Mem. in Supp. 27.] As explained below, the Court rejects both arguments.

### 1. Monopolization

A plaintiff must establish two elements for a monopolization claim under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). The "second element is often referred to as anticompetitive conduct or exclusionary conduct." *Mahaska Bottling Co.*, 271 F. Supp. 3d at 1067 (citation omitted).

Toyota USA first reiterates its assertion that because a manufacturer like Toyota can monopolize its brand, Allen's monopolization claim fails to state a claim.  [Toyota Mem. in Supp. 26.]  As explained above, Allen Interchange has properly alleged that Toyota USA monopolized its brand in a way that, if proven, could constitute an antitrust violation. Therefore, the Court rejects this argument.

Toyota USA next asserts that Allen Interchange's monopoly claim fails because Toyota has legitimate business purposes for imposing its gray market parts ban.  [*Id.* at 27.] To support its argument, Toyota lists the following business justifications: gray market Toyota-branded parts do not carry a Toyota USA warranty, preserving Toyota USA's trademark rights, protecting Toyota's reputation maintaining accurate production planning and ordering, and complying with other contractual commitments.  [*Id.*]  "[A]cts which only incidentally or indirectly restrict competition, while their principal purpose and effect is the reasonable advancement of legitimate purposes, are not prohibited by the law." *John Wright & Assocs., Inc. v. Ullrich*, 203 F. Supp. 744, 751 (D. Minn. 1962), *aff'd*, 328 F.2d 474 (8th Cir. 1964).  And "[c]onduct undertaken specifically to damage a competitor is not de facto anticompetitive; a § 2 plaintiff must allege that the conduct had or will have an actual anticompetitive effect." *Mahaska Bottling Co.*, 271 F. Supp. 3d at 1067 (citations omitted).  But at this stage, the Court should not weigh the competing narratives in deciding a motion to dismiss.

In its Counterclaim, Allen Interchange alleges that Toyota USA specifically intended to control prices and/or destroy its competition within the dealer market for Toyota Captive Parts for Non-Warranty Repairs by engaging in practices aimed at

preventing Toyota Dealers from buying any Toyota parts from a source other than Toyota USA. [Countercl. ¶¶ 165–66.] Allen Interchange further asserts that Toyota aimed to prevent Toyota dealers from buying any Toyota parts from a source other than Toyota USA and has engaged in anticompetitive conduct that has achieved monopoly power in the relevant market. [*Id.* ¶ 166.] These facts support an inference that Toyota willfully acquired or maintained monopoly power and that Toyota's conduct had an actual anticompetitive effect. Regardless of whether Allen Interchange is ultimately able to establish these allegations by sufficient proof to obtain a judgment in its favor, at this stage in the litigation, Allen Interchange has adequately stated a monopolization claim under Section 2 of the Sherman Act.

### 2. Attempted Monopolization

Toyota USA makes essentially the same arguments regarding Allen's attempted monopolization claim, and they are similarly unsuccessful. To plead an attempted monopolization claim, a plaintiff must allege: "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987). "Attempted monopoly claims are aimed at the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous possibility of it." *Id.* (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)). The Court readily

finds that Allen has sufficiently alleged a claim for attempted monopolization because there are adequate allegations as to all three elements.

First, Allen Interchange alleges that Toyota possessed a specific intent to control prices or destroy competition. "Specific intent need not be proven by direct evidence, but can be inferred from the defendant's anticompetitive practices or other proof of unlawful conduct." *Id.* at 802 (citing *Conoco Inc. v. Inman Oil Co., Inc.*, 774 F.2d 895, 905 (8th Cir. 1985)). In its Counterclaim, Allen Interchange asserts that Toyota USA specifically intended to control prices and/or destroy its competition within the dealer market for Toyota Captive Parts for Non-Warranty Repairs by engaging in practices aimed at preventing Toyota Dealers from buying any Toyota parts from a source other than Toyota USA. [Countercl. ¶¶ 165, 166.]

Similarly, Allen Interchange adequately alleges anticompetitive conduct as described above. Allen Interchange specifically alleges that:

> The conduct, activities, and practices aimed at achieving monopoly power in the Toyota Parts Market include, without limitation, (a) willful misrepresentations and misleading statements about its agreements with Toyota Dealers, grey market parts, and Toyota Parts sold by Allen Interchange, (b) implied or overt threats to Toyota Dealers that [Toyota USA] will terminate Dealer Agreements, and (c) on information and belief, recent attempts to amend and/or actual amendments of Toyota Dealer Agreements to explicitly bar the purchase of grey market parts altogether, including for Non-Warranty Repairs, with no justification other than to restrict competition and control prices

[Countercl. ¶ 166.]  These assertions are sufficient to withstand the motion to dismiss and the Court reserves for another day consideration of Toyota USA's proffered business reasons for this conduct.  Toyota's motion to dismiss Count 4 is denied.

Finally, Allen Interchange alleges that "a dangerous probability of monopolizing the Toyota Parts Market exists as Toyota Dealers have given up cheaper sources of Toyota Parts in response to [Toyota USA's] actions."  [*Id.* ¶ 168.]  The facts supporting the assertions are set forth in significant detail throughout the Counterclaim, which generally describes how Toyota USA allegedly coerces Toyota Dealers into refusing to buy Allen Interchange's parts.  [*Id.* ¶¶ 107, 108, 114, 115, 117, 121, 127, 124, 166, 167.]

### Count 5 – Naked Restraint of Trade

Toyota USA argues that Count 5 should be dismissed because it only alleges that Toyota USA imposed constraints on dealers without claiming that the dealers agreed to or voluntarily acquiesced to Toyota USA's request.  [Toyota Mem. in Supp. 21–23.] Under Section 1 of the Sherman Act pursuant to which Count 5 is brought, a claimant must demonstrate "that there was a contract, combination, or conspiracy." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009) (quotation omitted); *see also* 15 U.S.C. § 1. The required showing is that two or more people or entities "entered into either an express or *implied* agreement." *Insulate SB, Inc. v. Advanced Finishing Sys. Inc.*, 797 F.3d 538, 544 (8th Cir. 2015) (emphasis added) (quotation omitted).  But the "concerted action" may include coerced conduct that stems from threats to terminate an agreement.  *See, e.g.*, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 215 (3d Cir. 1992) ("The precedents are numerous that a § 1 conspiracy arises when

17

an unwilling dealer, to avoid termination by its supplier, promises to deal exclusively.") (cleaned up); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973–75 (7th Cir. 1995) (finding the "combination or conspiracy" element adequately pled by threats resulting in a coerced agreement and collecting cases confirming that acquiescence in an illegal scheme establishes the requisite agreement).  The Court disagrees that Allen Interchange has failed to allege concerted action here.

Allen Interchange asserts that Toyota USA made false and misleading statements and threatened to terminate dealer agreements if Toyota dealers purchased Toyota parts from other sources.  [Countercl. ¶¶ 113–19, 126–27.]  Allen Interchange further alleged that because of Toyota USA's threats Allen Interchange's customers stopped buying Toyota parts from Allen Interchange.  [*Id.* ¶¶ 2, 134.]  Because concerted action may include coerced conduct, the Court finds that Allen Interchange's allegations are sufficient to support an inference of the required "contract, combination or conspiracy."

Toyota USA also asserts that Count 5 should be dismissed as a matter of law because the Toyota Dealer Agreement allows purchases of parts not sourced from Toyota for non-warranty repairs; therefore, according to Toyota USA, there can be no "exclusive dealing arrangement" sufficient to entertain the claim.  [Toyota Mem. in Supp. 23–24.] However, Toyota USA's argument does not accurately characterize Allen's Counterclaim. Allen Interchange contends that "regardless of what the written Dealer Agreement says, [Toyota USA] has strong-armed Toyota Dealers to prevent them from purchasing Toyota Parts from anyone other than [Toyota USA]."  [Allen Mem. in Opp'n 37.] Specifically, Count 5 alleges that "[t]o the extent [Toyota USA] has imposed, via communications, contractual

18

amendments, or otherwise, a requirement on Toyota Dealers in its PMA to buy Toyota Parts exclusively through [Toyota USA], Toyota USA has engaged in a naked restraint of trade that violates the antitrust laws."  [Countercl. ¶ 173.]  Accordingly, the Court is not persuaded by Toyota USA's attempt to recast the nature of Allen Interchange's allegations. Allen Interchange has alleged sufficient facts to survive a motion to dismiss Count 5.

### Count 6 – Tying Arrangement

In Count 6, Allen Interchange argues that Toyota USA has unlawfully tied together its sale of new cars to the dealers to its demand that they only source replacement Toyota-branded parts from them in violation of 15 U.S.C. § 1 and 15 U.S.C. § 14. Toyota USA presents two arguments regarding this counterclaim.  Toyota first argues that there is no improper tying situation present.[3]  And second that "Allen has failed to adequately allege that Toyota USA has sufficient economic power in the market for new motor vehicles." [Toyota Mem. in Supp. 25.]  The Court rejects both arguments for the reasons discussed below.

"A tying arrangement is 'the sale or lease of one item (the tying product) on the condition that the buyer or lessee purchase a second item (the tied product) from the same source.'" *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) (quoting *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1498 (8th Cir. 1992)).  "[A] per se illegal tying arrangement

---

[3] Toyota USA also asserts that "automotive franchise laws prevent[] a cognizable claim for" tying.  [Toyota Mem. in Supp. 24.]  And that "applicable laws likewise require Toyota USA to provide its Authorized Dealers with Genuine Toyota Parts."  [*Id.* at 25.] Toyota USA fails to identify any specific "automotive franchise laws" or other applicable laws that require dismissal of the tying counterclaim.

does not exist unless the defendant has coerced buyers into purchasing a product [or service] which such buyers otherwise would not have purchased or would have purchased from a different source than the defendant." *Amerinet*, 972 F.2d at 1499.

Allen Interchange alleges that "to the extent [Toyota USA] has imposed, via communications, contractual amendments, or otherwise, a requirement on Toyota Dealers in its [dealer agreement] to buy Toyota parts exclusively through Toyota USA, Toyota USA has engaged in a tying arrangement that amounts to a per se violation of the antitrust laws." [Countercl. ¶ 181.]  Specifically, Allen Interchange alleges that Toyota USA has made written and oral statements to Toyota dealers that "any purchase by them of Toyota parts from any source but TMS will violate the terms of the Toyota Dealer Agreement; that they are prohibited from buying Toyota Parts from any source other than TMS; and that doing so will permit TMS to invoke its right, pursuant to the Toyota Dealership Agreement, 'to terminate [the] Agreement immediately" for "[b]reach or violation by DEALER of any other term or provision of this Agreement.'"   [*Id.* ¶¶ 114, 117.]  The result of such a termination would be denying them access to new cars because of their purchase of Toyota parts from another source.  These allegations are adequate to allege that Toyota USA has sufficient economic power in this arena to sustain an unlawful tying claim.

As discussed above, Allen has asserted a relevant market with two distinct products – new Toyota vehicles and Toyota replacement parts for non-warranty service.  [*Id.* ¶182.] Allen Interchange likewise asserts that Toyota USA has power over the sale of new Toyota vehicles to Toyota dealers that is capable of restraining competition in the Toyota parts market.  [*Id.* ¶ 183.]  Courts have found plausible per se tying claims under similar

circumstances.  *See, e.g.*, *Metrix Warehouse, Inc.*, 828 F.2d at 1036–40 (affirming jury finding of per se tying through dealer contract between new Mercedes vehicles and Mercedes replacement parts); *George Lussier Enter., Inc. v. Subaru of New England, Inc.*, No. CIV C-99-109-B, 1999 WL 1327396, at *4 (D.N.H. Dec. 13, 1999) (finding a plausible tying claim under *Kodak* where "the 'lock-in products' are the Subaru franchises (analogous to the Kodak equipment), the 'tying products' are the Subaru vehicles (analogous to the Kodak replacement parts), and the 'tied products' are the accessories (analogous to the Kodak service)"). The Court sees no basis to dismiss Allen's adequately pled tying claim.

### Count 7 – Minnesota Law Antitrust Violations

Toyota USA also seeks dismissal of Allen Interchange's state-law antitrust claims, arguing essentially that because the federal claims are flawed, the state claims are as well. The Court agrees that the federal and state claims essentially rise and fall together at this stage. "Minnesota law is interpreted consistent with the federal court's construction of the Sherman Act."  *Lamminen v. City of Cloquet*, 987 F. Supp. 723, 734 (D. Minn. 1997) (citing *State by Humphrey v. Road Constructors, Inc.*, 474 N.W.2d, 225 n. 1 (Minn. Ct. App. 1991)); *see also Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) ("As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently.").  But having decided that Allen Interchange has alleged sufficient facts to survive a motion to dismiss on its federal antitrust claims, it must likewise deny the motion as to the Minnesota law antitrust violations.

### C.  Other Counterclaims

Toyota USA also moves to dismiss Allen Interchange's remaining counterclaims: Unfair Competition (Count 1); Tortious Interference with Prospective Economic Advantage (Count 2); Minnesota Deceptive Trade Practices Act Violation (Count 3), and Unjust Enrichment (Count 8).  The Court denies the motion to dismiss as to these claims as well.

### Counts 1 and 3 – False Advertising

Allen Interchange pleads counterclaims of false advertising under both the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (Count 1), and Minnesota's Deceptive Trade Practices Act, Minn. Stat. §325D.44 (Count 3).  The Court finds that Allen Interchange has alleged sufficient facts to withstand Toyota USA's motion to dismiss these claims.

Under the Lanham Act, a plaintiff must prove the following elements to establish a false advertising violation:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).  Four factors must be present for speech to constitute commercial advertising:

(1) the representations must be commercial speech; (2) they must be made by a defendant who is in commercial competition with the plaintiff; (3) they must be made for the purpose of influencing consumers to buy defendant's goods or services; and (4) they must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Grp. Health Plan, Inc. v. Phillip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069–70 (D. Minn. 1999). Although many false advertising cases involve statements to consumers, misrepresentations to intermediate purchasers are also actionable. *See Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1114 (8th Cir. 1999) (noting that the customers receiving the allegedly deceptive communications were intermediary vendors).

Allen Interchange describes several allegedly false and misleading statements by Toyota USA to its dealers in its dealer communications. First, Allen Interchange alleges Toyota USA's statements about its Dealer Agreement misrepresent the commercial activities of Toyota USA and its dealers, and therefore violate section 1125(a)(1)(b). Specifically, in its Counterclaim, Allen Interchange alleges that Toyota USA falsely stated that "[t]he purchase . . . of unauthorized, gray market parts within [Toyota USA's] PMA [Primary Market Area], or anywhere, is . . . a breach of your dealer agreement."[4] [Countercl. ¶ 114.] Allen Interchange asserts this statement is false because the Dealer

---

[4] Toyota USA argues that as a stranger to its contracts with its dealers, Allen Interchange has no legal right to make assertions about the meaning of Toyota USA's contract with its dealers. [Toyota Mem. in Supp. 13–14.] Toyota USA is correct that a stranger to a contract generally lacks standing to bring claims or seek relief based on the contract. *See Wurm v. John Deere Leasing Co.*, 405 N.W.2d 484, 486–87 (Minn. Ct. App. 1987). However, Allen Interchange does not raise any contract claims against Toyota USA. Instead, Allen Interchange is bringing antitrust claims, which it is permitted to do even as an outsider to the Dealer Agreement. *Metrix Warehouse*, 828 F.2d at 1036 (provision of auto dealer agreement formed basis for antitrust claims).

Agreement allows for purchases of Toyota parts from other sources, including for non-warranty repairs.

The Counterclaim alleges other misrepresentations as well, including Toyota USA's alleged misleading use of the term "Genuine Toyota Parts," statements about safety of "gray market parts," and assertions about Allen Interchange's products. [Countercl. ¶¶ 120–33.] Allen Interchange acknowledges that Toyota USA defines "Genuine Toyota Parts" in its Dealer Agreement as Toyota parts sourced through Toyota USA, but argues that Toyota USA uses the term "Genuine" in other communications with Toyota dealers to create confusion as to whether parts that do not come from Toyota USA are indeed made by Toyota companies. [*Id.* ¶¶ 120–25.] Allen Interchange likewise alleges that Toyota USA makes statements about "gray market" parts to create confusion as to whether the parts have safety issues, even though they are parts made by Toyota entities. [*Id.* ¶¶ 126–27.] Lastly, Allen Interchange alleges that Toyota USA sent out flyers depicting a pallet with Toyota parts recognizable as an Allen Interchange shipment with misleading statements about the parts and packaging contained therein. [*Id.* ¶¶ 128–33.]

Toyota USA asserts that the false advertising claims fail because Allen Interchange must "allege a false statement about the nature of the defendant's products and actual deception," and Toyota USA argues that the statements it made were literally true. [Toyota Mem. in Supp. 29–30.] The Court rejects this assertion for several reasons. First, "statements that are literally true or ambiguous, but also have a tendency to mislead or deceive the consumer" are also actionable. *Clorox*, 140 F.3d at 1182. Whether a literally true statement is misleading or deceptive is "a classic question of fact," which is ultimately

established by evidence and is not appropriate for us to decide at the pleading stage. *Id.* at 1183. Further, although cases often involve statements about a "product," the Lanham Act also covers statements about "commercial activities." *See Insignia Sys., Inc. v. News Am. Mktg. In-Store.*, Civil No. 04-4213 (JRT/AJB), 2007 WL 2893374, at *6 (D. Minn. Sept. 28, 2007) (finding that "commercial activities" reached statements that third-party "contracts were unenforceable" and allowing counterclaim to withstand a motion to dismiss). And here, though perhaps Toyota USA is correct that some of the statements at issue are literally true, Allen adequately alleges that others are in fact false. *Clorox Co.*, 140 F.3d at 1180 (explaining that the false statement necessary to establish a Lanham Act violation includes claims that "may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers") (citations omitted).

Allen Interchange's claims assert that Toyota USA misrepresented Allen Interchange's commercial activities through commercial speech with dealers. At this stage in the proceedings, that is sufficient to state a claim for false advertising under the Lanham Act. And because the Minnesota Deceptive Trade Practices Act "mirrors" the Lanham Act such that court "use the same analysis to evaluate false advertising claims that are made simultaneously under the federal and state statutes," *Med. Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 649 (D. Minn. 1994), the Court finds that Allen Interchange has successfully alleged a claim under the Minnesota Deceptive Trade Practices Act.

**Count 2 – Tortious Interference with Prospective Economic Advantage**

Under Minnesota law, to recover for tortious interference with prospective economic advantage, a party must prove: (1) the existence of a reasonable expectation of economic advantage; (2) the other party had knowledge of that expectation; (3) intentional interference with that expectation, such that the interference was either independently tortious or in violation of a state or federal statute or regulation; (4) a reasonable probability that the party would have realized the economic advantage or benefit in the absence of the offending party's wrongful act; and (5) damages. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014).

Toyota USA argues that the Court should dismiss this claim for two reasons, but neither supports dismissal. First, Toyota USA contends that its alleged actions do not meet the "independently tortious or in violation of state or federal law" element of a claim because Toyota USA has not violated the antitrust laws. [Toyota Mem. in Supp. 31–32.] However, the Court has found that Allen Interchange has plausibly alleged violation of antitrust laws, and these allegations are enough at this stage to satisfy the requirements of pleading tortious interference.

Second, Toyota USA argues that Allen Interchange "has failed to identify a specific third party with whom it has a reasonable probability of a future economic relationship." [*Id.*] Toyota USA seems to rely on *Gieseke* to support this argument. For several reasons, this challenge is unsuccessful. First, *Gieseke* provides only the elements required to *prove* tortious interference with prospective economic advantage, not the elements required to *plead* that claim. *See* 844 N.W.2d at 221–22; *see also Paisley Park Enter., Inc. v. Boxill*,

361 F. Supp. 3d 869, 881 (D. Minn. 2019) (observing that *Gieske* did not provide the elements required to plead a tortious interference claim).  But, even if identification of a specific business partner or customer is a pleading requirement, Allen Interchange satisfies this requirement.  Allen Interchange has alleged that Toyota USA's actions caused Allen Interchange's "customers, including for example, Lou Fusz Toyota (St. Louis, MO), to stop buying Toyota Parts from Allen Interchange and end their longstanding relationships with Allen Interchange." [Countercl. ¶ 134.][5]  Moreover, a party is not required to show "existing or prospective legal or contractual rights."  *See Sorin Group USA, Inc. v. St. Jude Med., S.C., Inc.*, 176 F. Supp. 3d 814, 833 (D. Minn. 2016) (quotation omitted).  Instead, a plaintiff might show "relatively consistent historical sales" to a customer, which "suggest[s] that it likely expected to continue success there."  *Id.* at 834.

For these reasons, the Court denies Toyota USA's motion to dismiss Count 2 of Allen Interchange's counterclaim.

### Count 8 – Unjust Enrichment

Finally, in a very brief discussion, Toyota USA argues that "[i]n Minnesota, to state a claim for unjust enrichment, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." [Toyota Mem. in Supp. 33 (citing *Luckey v. Alside, Inc.*, 245 F.

---

[5] Allen Interchange further explains that "[a]lthough other specific examples exist, in the absence of a protective order at this stage, Allen Interchange is limiting identification of examples to a former customer of which TMS is already aware, to minimize any risk of retaliation by [Toyota USA] against Allen Interchange's former customers." [Countercl. ¶ 134 n. 3.]

Supp. 3d 1080, 1099 (D. Minn. 2017) (cleaned up)).]  Toyota USA argues that it has not done anything wrong because it has merely made "legal attempts to protect its trademarks and brand from improper gray market activity."  [*Id.*]  But as explained above, the Court declines to assess Toyota USA's competing narrative and make a determination on the legality of Toyota USA's actions at this stage.

To sufficiently plead an unjust enrichment claim, a party must allege that: (1) a benefit was conferred on the defendant; (2) the defendant knowingly accepted the benefit; and (3) the defendant's acceptance and retention of the benefit make it inequitable not to provide compensation.  *See Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 304 F. Supp. 3d 815, 826 (D. Minn. 2018).  Here, Allen Interchange alleges that Toyota USA has diverted to itself "business, customers, monies, contracts, sales, goodwill, and loyalty intended for Allen."  [Countercl. ¶ 134.]  The Court determines that Allen Interchange's unfair competition allegation is sufficient at this stage.  Accordingly, the Court denies Toyota USA's motion to dismiss Count 8.

## III.   Order

Based on the foregoing discussion, the **IT IS HEREBY ORDERED that** Toyota USA's Motion to Dismiss Allen Interchange's counterclaims pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 33], is **DENIED**.

Date: August 14, 2023

   *s/Katherine Menendez*
   Katherine Menendez
   United States District Judge