## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Toyota Motor Sales, U.S.A., Inc.,

     Plaintiff,

v.

Allen Interchange LLC, Applegate
Supply, Patriot Parts of Texas,
Bluestone Auto Products, OEM Surplus,
Autoworks Distributing, Factory Parts
Direct, Does 1-10,

     Defendants.

Allen Interchange LLC,

     Counter Claimant,

v.

Toyota Motor Sales, U.S.A., Inc.,

     Counter Defendant.

Case No. 22-cv-1681 (KMM/JFD)

**ORDER ON DISCOVERY MOTIONS**

This matter is before the Court on four motions pertaining to discovery in this case: Allen Interchange, Inc.'s ("Allen") Motion for Protective Order (Dkt. No. 253); Allen's Motion to Compel (Dkt. No. 281); Toyota Motor Sales, U.S.A., Inc.'s ("Toyota") Motion to Compel (Dkt. No. 290); and Toyota's Motion for the Issuance of Letters of Request (Dkt. No. 302.) The Court heard oral argument on all four motions on November 7, 2024.

1

## BACKGROUND

This lawsuit involves claims and counterclaims between competitors selling Toyota parts to Toyota dealers in the United States. (*See generally* Dkt. Nos. 5, 15.) Toyota Motor Sales, USA, Inc. ("TMS"), a subsidiary wholly owned by Toyota Motor North America, Inc. ("TMNA"),[1] filed the suit alleging trademark violations under the Lanham Act against Allen Interchange LLC ("Allen"),[2] focusing on the latter's importation and sale of Toyota parts in the United States. (*See* Dkt. No. 5.) In response, Allen filed an aggregate of eight counterclaims against both TMS and TMNA (collectively, "Toyota"). (*See* Dkt. No. 15.)

Toyota sells vehicles and parts to Toyota dealers under a standard dealer agreement. Most parts in Toyota vehicles do not have aftermarket substitutes from independent third parties. The parties refer to such parts as "Captive Parts." Toyota dealers sell Toyota vehicles, provide repair and maintenance services, and may sell Toyota parts to owners. Toyota allegedly sells parts in the U.S. at significantly higher prices than the prices charged by other Toyota entities elsewhere in the world.

---

[1]  Toyota Motor North America, in turn, is a subsidiary of Toyota Motor Corporation, a Japanese company ("Toyota Japan") which is not a party to this lawsuit. (*See generally* Dkt. No. 58 (order denying Allen Interchange's motion for joinder of Toyota Motor Corporation).)

[2]  The Amended Complaint named other defendants, including Applegate Supply, Patriot Parts of Texas, Bluestone Auto Products, OE Parts Company, Factory Parts Direct, Autoworks Distributing, and Does 1 through 10. (Dkt. No. 5 at 1.) In its answer, Allen Interchange acknowledged that none of the remaining named defendants are legal entities, they are instead "names under which Allen Interchange has conducted business." (Dkt. No. 15 at 1 n.1.)

Allen Interchange competes with Toyota for sales of Toyota parts. Allen Interchange purchases Toyota parts initially sold outside the U.S. and resells them to Toyota dealers and others in the U.S. at lower prices than equivalent parts that Toyota sells directly in the U.S. market. The parties refer to Toyota parts purchased outside the U.S. and resold within the U.S. by Allen Interchange and other, like resellers, as "Gray Market Parts." While these parts are manufactured and sold by Toyota, they are not meant by Toyota for sale in the United States. According to Allen Interchange, Gray Market Parts bear the same part numbers and are identical in design, function, and quality as Toyota parts that are intended for sale in the U.S. market.

Toyota brought several causes of action against Allen Interchange under the Lanham Act. Toyota alleges that Allen Interchange is a Gray Market Parts supplier, importing and selling Toyota-branded parts intended by Toyota for sale or use outside the U.S. Toyota claims these parts have material differences from the "genuine" parts it sells, such as the absence of a manufacturer-backed warranty, the shipping of the parts, and the handling of "outdated" parts.

In response, Allen Interchange asserted several antitrust and related counterclaims, alleging that Toyota engaged in anticompetitive and unfair conduct that was aimed at preventing authorized Toyota dealers from purchasing and reselling parts from Allen Interchange. Before the Court are four discovery motions, two from Allen and two from Toyota (Dkt. Nos. 253, 281, 291, 302.) The Court heard oral argument on all four.

## I.    <u>Legal Standards</u>

Federal Rule of Civil Procedure 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). In determining proportionality, courts consider numerous factors, including "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

If a party believes that an opposing party has failed to respond to discovery, or has served insufficient responses, it may "move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1). A court may compel responses if a party fails to designate a witness for deposition as noticed under Rule 30, to answer an interrogatory propounded under Rule 33, or to produce documents requested under Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(ii)–(iv). For purposes of such a motion, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

A proper discovery response must either answer the request fully or state with specificity the grounds for objecting to the request. *See* Fed. R. Civ. P. 33(b), 34(b)(2). Objections must be stated with specificity and in relation to specific requests; any ground "not stated in a timely objection is waived unless the party's failure to object is excused by the court for good cause." *Cargill, Inc. v. Ron Burge Trucking, Inc.*, 284 F.R.D. 421, 424

(D. Minn. 2012). The party seeking discovery bears the initial responsibility for making a threshold showing of relevancy before the production of information is required. *See, e.g.*, *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). "Courts generally have wide discretion in granting or denying discovery requests." *Reese v. Sherburne Cnty. Det. Ctr.*, No. 0:19-CV-1975-ECT-KMM, 2021 WL 1723780, at *1 (D. Minn. Mar. 16, 2021) (citing *Robinson v. Potter*, 453 F.3d 990, 994–95 (8th Cir. 2006); *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630 (8th Cir. 2000).

## DISCUSSION

I. **Allen's Motion for Protective Order and Toyota's Motion for the Issuance of Letters of Request/Letters Rogatory**

Toyota has moved the Court to issue letters rogatory to request various information from Allen's suppliers outside of the United States. (Dkt. No. 302.) Heard at the same hearing was Allen's motion for a protective order to prevent Toyota from issuing subpoenas to its suppliers (Dkt. No. 253), a list of which the Court ordered to be disclosed in its August 1, 2024 Order. (August 1, 2024 Order 22, Dkt. No. 224.) Toyota's request for letters rogatory seeks two letters, one for each of two of Allen's Canadian suppliers, while Allen's motion for a protective order seeks a protective order blocking all further discovery from its suppliers, both foreign and domestic. Toyota's foreign and domestic requests seek a wide range of documents from Allen's suppliers regarding the suppliers' relationships with Allen, the suppliers' parts handling practices, and any possible warrantees or guarantees provided by the suppliers to Allen with the parts. (Pls.' Mem. in Opp. to Mot. for Protective

5

Order 5–6, Dkt. No. 266.) The Court views these motions as two sides of the same coin and therefore addresses them together.

Federal Rule of Civil Procedure 26 provides for the entry of a protective order on motion by the party from whom discovery is sought. Fed. R. Civ. P. 26(c)(1). Upon a showing of good cause, a court may issue such an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* "[T]he movant bears the burden of demonstrating the necessity of a protective order." *Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 237 (D. Minn. 2013). In deciding on a motion to limit discovery, the Court must balance the hardship to the movant, if the discovery is allowed, with that of the non-movant if the discovery is barred. *Sherman v. Sheffield Fin., LLC*, 338 F.R.D. 247, 252 (D. Minn. 2021). In its motion, the movant "cannot rely on broad or conclusory allegations of harm." *Id*. at 252.

## A. Risk of Harm to Allen

Allen's primary argument is that Toyota's efforts to send subpoenas to its suppliers constitute a continued effort to harass and intimidate those suppliers into ceasing business relationships with Allen. (Def.'s Mem. in Supp. of Mot. for Protective Order 4–5, Dkt. No. 256) ("[T]he motivation for seeking supplier information is clear: once the Toyota Parties learn who the suppliers are, Toyota will bring pressure on those suppliers to cut off supply to gray market competition, such as the competition the Toyota Parties face from Allen"). In so arguing, Allen states that it is not the information that Toyota seeks, but the act of subpoenaing the suppliers itself, that would cause its harm. (*Id*. at 2.) Allen's fears arise from its apprehension that Toyota, the ultimate source of all genuine Toyota parts, will use

6

the subpoenas to strongarm suppliers—who rely on Toyota for parts—into cutting off ties with Allen, leaving Allen with no way to source the parts it sells. Allen also alleges that obtaining this discovery was the primary purpose of Toyota's suit, at large, rather than ameliorating any harm caused by Allen's sale of gray market parts. (*Id*. at 13.) Allen has provided the Court with some evidence that while it is not certain that harm will follow from the issuance of the subpoenas, the risk of harm is not negligible. (*Id*.)

Toyota argues that Allen's argument is based on conclusory and speculative allegations that cannot provide the grounds for a protective order. (Pls.' Mem. in Opp. to Mot. for Protective Order 24–27, Dkt. No. 266 (citing *Sherman*, 338 F.R.D. at 252).) Toyota characterizes Allen's concerns about impacts on its business as "vague and unsupported." (*Id*. at 24.) While this argument seems facially reasonable, Allen's argument becomes more tenable in the context of this case and the Toyota statements that Allen has provided the Court. (*See* Nelson Decl. in Supp. of Protective Order, Exs. C, D (showing that legal action against gray market suppliers is part of Toyota's business strategy to reduce competition by such suppliers and "Recover OEM sales").)

### B. Relevance to Toyota's Claims and Defenses

Even so, Toyota argues that the relevance of the information to its Lanham Act claims outweighs the potential harms to Allen's business. Toyota claims that the information is relevant to damages, whether the parts exchanged between the suppliers and Allen were intended to be sold in the United States, and whether those parts are materially different from the parts Toyota sells through Toyota-approved channels. Toyota provides no support for its argument that the information is relevant to damages, and the Court sees

no reason why information from suppliers is necessary to prove Toyota's damages. Sales information from Allen itself should be sufficient to do so.

1.    <u>Intent to Sell in the United States</u>

Toyota's argument that the information is relevant to determining whether the parts were intended to be sold in the United States is more tenable. The three domestic entities that Allen listed as suppliers are Toyota dealerships in the United States. Toyota is correct in stating that whether the parts provided by these three dealer/suppliers were intended to be sold in the United States is relevant to their Lanham Act claims, and those dealer/suppliers are in the best position to assess and provide that information. The nature of the gray market for auto parts (i.e., that gray market sellers profit by buying from foreign markets at prices lower than the price in the United States and that these actions undercut authorized seller profits in the United States) indicates that buying parts from an American dealer/supplier, which sourced its parts through the "proper," Toyota-approved channels would be counterproductive to Allen's business model. This in turn may indicate that these parts were sourced through other channels. Allen makes no arguments regarding these issues as to the foreign suppliers, specifically, and because they are foreign suppliers, it seems highly unlikely that the products they supplied to Allen were intended by Toyota to be sold in the United States.

2.    <u>Material Differences</u>

Toyota also claims the information it seeks is relevant to showing that there are material differences between the parts that reach consumers through the Toyota-approved supply chain and those that reach consumers through the gray market. (Pls.' Mem. in Opp.

to Mot. for Protective Order 10–16, Dkt. No. 266.) For Lanham Act claims, a material difference is a difference that a consumer would find relevant in deciding to purchase one item over the other, and Courts have established this to be a low threshold. *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246 (2d Cir. 2009). The main material differences Toyota alleges between parts that come through the Toyota-approved supply chain and those that come through the gray market are differences in warranty coverage and differences in "supply chain and/or quality control measures." (Pls.' Mem. in Opp. to Mot. for Protective Order 12, Dkt. No. 266.)

Allen states that additional discovery from the suppliers is not necessary for either party to argue the material differences issue. Allen argues that,

> material difference is whether the products themselves have some difference to them when the consumers have them in their hands. … That's something that the jury can take a look at … by looking at the products themselves …. We don't need to look at the supply chain itself to determine how they look in the courtroom.

(Nov. 7, 2024 Hr'g Tr. 7:7–16.)

### a. *Warranty Coverage*

On the issue of material differences in warranty coverage between the products, the parties agree that differences in warranty coverage may constitute "material differences" under the Lanham Act. The law supports the parties' agreement. *See USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1075-76 (10th Cir. 2009); *Kia Motors Am., Inc. v. Autoworks Distrib.*, 31 ITRD 1795 (D. Minn. 2009). What the parties do not agree on is the extent to which Toyota needs discovery from Allen's suppliers to make that claim: Toyota says that if "Allen plans to argue that the Toyota Branded Parts it sells are covered

9

by some type of 'Manufacturer Warranty' as advertised to the consuming public, Toyota is entitled to know what warranties, if any, are offered by Allen's suppliers." (Pls.' Mem. in Opp. to Mot. for Protective Order 20, Dkt. No. 266.) But the Court does not see how Allen's suppliers would have any documents relevant to whether Allen provides a warranty to its customers.

Either Allen, its customers, or Toyota itself are the only parties that could provide a viable warranty to an end consumer. A warranty from Allen would hypothetically cover its customer repair shops, who install the parts on an end-user's car or any direct-to-consumer sales. A warranty from the customer repair shops would cover damages to a consumer's vehicle as a result of repair work. And a warranty from Toyota effectively guarantees the quality of the part made by Toyota. Suppliers merely divert the parts from an authorized Toyota supply chain to Allen, and whether the warranty that Toyota provides with its parts is valid is entirely up to Toyota and how the language of its warranty addresses parts acquired through the gray market. When a customer makes a warranty claim on a Toyota-manufactured part at a Toyota service center or other repair shop, that claim is sent to Toyota for processing, and Toyota decides whether to make compensation under the warranty. So, whether the Toyota-manufactured, Allen-sold parts have a materially different warranty when they leave Allen's facilities than do similar parts sold through Toyota-approved channels is a matter of interpreting *Toyota's* warranty claim review process, rather than anything to do with Allen's suppliers. Therefore, the information Toyota seeks from Allen's suppliers regarding warranties is not relevant and not discoverable.

b. *Supply Chain and Quality Control Differences*

Whether supply chain differences or differences in quality control measures in and of themselves can constitute a material difference under the Lanham Act has not been addressed by the Eighth Circuit or any other circuit. The Court is not convinced they can, at least not to the extent that it justifies abandoning the Court's previous approach to supplier discovery here. Certainly, supply chain or quality control differences could *cause* material differences between parts, but material differences in the products must be observed in the products themselves. The Court does not recognize the validity of a claim of material difference that is premised *solely* upon differences in the processes by which parts are made, supplied, checked for quality, etc., but without a resultant detectable difference in the product itself.[3] For the purposes of false advertising claims, the issue that the parties must address is *whether* there are material differences between the products, not *why* any such differences may exist. Any material differences that result from differences in these processes can be discovered by inspecting and testing the parts themselves.

---

[3] This does not mean the detectable difference is limited to the physical object that is the Toyota part. For example, courts have recognized that a difference in warranty is a material difference. *See USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1075-76 (10th Cir. 2009); *Monahan Prod. LLC v. Sam's E., Inc.*, 463 F. Supp. 3d 128, 141 (D. Mass. 2020); *Kia Motors Am., Inc. v. Autoworks Distrib.*, 31 ITRD 1795 (D. Minn. 2009); *Perkins Sch. for the Blind v. Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 324 (E.D.N.Y. 2003). But a difference in warranties can be detected, by placing the warranties side-by-side and comparing their language. What the Court is concerned with here is a claimed material difference that is not premised on an observable difference between the parts, but instead is premised entirely on the two products, for example, being made in different factories or brought to market through different channels. To be sure, these are differences; but they are not material differences in the products.

Accordingly, information Toyota seeks from Allen's suppliers regarding their supply chains and quality control measures is not relevant and not discoverable.

**C. Effect of the Court's Previous Ruling**

Allen also argues that the Court's previous ruling in its August 1, 2024 order bars Toyota from pursuing both its domestic subpoenas and its request for letters rogatory. (*See* August 1, 2024 Order 22, Dkt. No. 224) ("Toyota has demonstrated the need for the identity of Allen Interchange's suppliers—but not other related information.") In response, Toyota argues that the requests in the subpoenas are different enough from the requests that the Court rejected in August that the Court should not consider that order as dispositive here. (Pls.' Mem. in Opp. to Mot. for Protective Order 7–8, Dkt. No. 266.) Toyota argues that the previously rejected requests were about the identity of the suppliers, while these new subpoenas request "different and additional information relevant to the claims and defenses in this case," such as contracts between the suppliers and Allen, when Allen began purchasing from the supplier, where the suppliers sourced their parts, and information on the suppliers' supply chains, among other things. (*Id*.)

Toyota's argument is flawed. While the requests in Toyota's supplier subpoenas are worded differently than the originally rejected requests, they do not escape the bar on additional supplier information that the Court imposed in August. The Court said, "Toyota has demonstrated the need for the identity of Allen Interchange's suppliers—but not other related information." (August 1, 2024 Order 22, Dkt. No. 224.) It is clear that this order set the suppliers' identities as the outer limit on the information discoverable about the suppliers without an adequate additional showing of necessity.

With these new requests, Toyota seeks the same or similar information in a more intrusive and perhaps impactful way. The previous requests, which the Court denied, sought much of this information from Allen, a party in this case. These new requests seek that information from third parties. If Toyota had not made a sufficient showing of need in August for information from Allen, the bar for it to prove the necessity of similar information from third parties is surely substantially higher. Here, Toyota's arguments are the same as they were before the Court's August Order: that Toyota needs information about the suppliers' relationship with Allen, their handling practices, and warranty information to show that there are material differences between the products. (Pls.' Mem. in Opp. to Mot. for Protective Order 9, Dkt. No. 266.) Ultimately, even where Toyota has viably claimed that the discovery it seeks is relevant and even if Allen's concerns of impacts on its business were insufficient to protect against the subpoenas Toyota seeks to issue, the Court's previous order continues to bind the parties and clearly bars Toyota's subpoenas. Accordingly, the Court grants Allen's Motion for Protective Order. (Dkt. No. 253.) Because the supplier discovery that Toyota seeks is unavailable, the Court also denies Toyota's Request for Letters Rogatory. (Dkt. No. 303.)

## II.    **Toyota's Omnibus Motion to Compel**

Toyota asks the court for an order compelling a range of discovery from Allen including 1) a recorded inspection of Toyota parts in Allen's possession; 2) a recorded inspection of Allen's warehouse facility; 3) a de-designation of Allen's customer list from "Attorneys Eyes Only" to "Confidential"; 4) documents responsive to Toyota's Requests

for Production ("RFPs") 63 and 64; and 5) photographs responsive to Toyota's RFPs 25–27. (Pls.' Mot. to Compel 1–2, Dkt. No. 291.)

Fed. R. Civ. P. 34(a) allows parties to inspect documents, electronically stored information, or tangible things in the possession, custody, or control of a responding party as long as the subject of that investigation is within the scope of discoverability under Fed. R. Civ. P. 26(b). A party may also deliver a request to "permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect … the property or any designated object or operation on it." Fed. R. Civ. P 34(b)(1) (A request for such an inspection "must describe with reasonable particularity each item or category of items to be inspected; must specify a reasonable time, place, and manner for the inspection and for performing the related acts; and may specify the form or forms in which electronically stored information is to be produced.").

## A. Recorded Parts Inspection

Toyota seeks to inspect a number of the Toyota parts that Allen sells in an effort to prove material differences between those parts and the parts sold through Toyota-approved supply chains. Allen states that Toyota "has not satisfactorily explained its need to inspect any additional Toyota Parts, given that it had the opportunity for an extensive and unsupervised inspection of 138 Toyota Parts sold by Allen Interchange prior to filing the lawsuit." (Def.'s Mem. in Opp. to Mot. to Compel 22, Dkt. No. 315.) In principle, the Court agrees with Toyota that a parts inspection is necessary here, where material differences between the parts sold by Allen and the parts sold through the Toyota-approved supply chain are outcome-determinative of Toyota's Lanham Act claims. Parts sold by Allen will

be inspected because the inspection has a high likelihood of providing relevant information vis-à-vis material differences, or lack thereof, between the parties' parts. The inspection may take place at a location of Allen's choosing. Allen's objection to having an inspection at all is overruled.

The issue then reduces to describing in detail the terms of that inspection. Toyota claims that Allen advertises over 15,000 Toyota parts to its customers, and that Allen had originally agreed to allow Toyota to inspect a "representative sample" of those parts. After significant back-and-forth between the parties, by the time of the November 7, 2024 hearing, they appear to have agreed (noting Allen's overall objections to the inspection) on a number of parts to be inspected (147). In its briefing, Allen stated, "Allen Interchange is not opposed to an inspection of 40 parts—or even a number approaching the full 147 parts that TMS wants." (Def.'s Mem. in Opp. to Mot. to Comp. 23, Dkt. No. 315.) As Toyota states, the 147 parts "reflect approximately 1% of the total 15,000 Toyota parts Allen has sold." (Pls.' Mot in Supp. of Mot. to Comp. 14, Dkt. No. 293.) The Court agrees that 147 parts is a reasonable and proportionate number to be inspected for the material differences Toyota alleges exist between parts sold by Allen and those sold through Toyota-approved methods. Further, as a matter of fairness, if Toyota damages any part belonging to Allen in the process of the inspection, Toyota will reimburse Allen at the reasonable market value of the part.

The Court is left to decide 1) whether that inspection will be recorded; 2) the method and affiliation of a person conducting any recording of the inspection; and 3) access to the fruits of the inspection. Allen seeks to impose certain conditions on the inspection.

> First, **no electronic devices** (including cell phones or testing equipment) would be present during the inspection and a **neutral videographer** would create a **video and/or photos of the parts that would be AEO** and **available to both sides**. Second, the Toyota Parties would be required to produce, **for each part to be inspected, all specifications**, including for labeling and packaging, as well as all photographs of the part available, such as in the Toyota Parties' photo library."

(Def.'s Mem. in Opp. to Mot. to Comp. 23, Dkt. No. 315 (emphasis added).) Toyota states that these conditions were demanded after Allen agreed to a parts inspection and violated the Court's discovery order by demanding that the list of parts that Toyota inspects be designated as Attorneys Eyes Only. (Pls.' Mot in Supp. of Mot. to Comp. 13–18, Dkt. No. 293.)

As this Court has held previously, "[h]aving a clear record of what occurred in the [discovery event] benefits both parties." *Silbernagel v. Westfield Ins. Co.*, No. 22-CV-1979 (JRT/JFD), 2023 WL 2264277, at *1 (D. Minn. Feb. 28, 2023). In *Silbernagel*, the Court was asked to determine whether a medical examination under Rule 35 could be recorded and concluded that it could because the party opposing recording had "failed to show that [the] recording of the examination would impede or impact the examination." *Id*. Here, similarly, the Court finds that recording the parts inspection would not impede or impact the inspection, and that having a clear record will benefit both parties. The parties will jointly select a neutral videographer, who will record the inspection from beginning to end. A time stamp will appear in a position in the video frame where the time stamp does not obscure the inspection, so that any editing of the video is apparent. (If the parties agree on another method for making editing or other tampering with the video apparent, and the videographer agrees it is technically feasible, they may use that method without further

order from the Court.) A copy of the video will be provided to each party. The videographer will keep the original, unedited video until this case concludes.  As to the confidentiality designations of the videos and photographs taken at the inspection, the Court cannot rule on the confidentiality of something that does not yet exist. The videos and recordings created by each side will be subject to the same protective order as all other discovery in this case and will be subject to the confidentiality rules and designation procedures therein. (*See* Amended Protective Order, Dkt. No. 108.)

Finally, Allen demands that Toyota provide "all specifications, including for labeling and packaging, as well as all photographs of the part available, such as in the Toyota Parties' photo library" for each part to be inspected. (Def.'s Mem. in Opp. to Mot. to Comp. 23, Dkt. No. 315.) Toyota only objects to this request to the extent that it demands those specifications and photographs be provided before the inspection, on the grounds that it is concerned that Allen will pick its most closely similar parts for the inspection. (Nov. 7, 2024 Hr'g Tr. 32:18–33:8, Dkt. No. 326.) Allen's counsel suggested as a solution that the specifications and photographs in question be provided to Allen at the inspection, to eliminate Toyota's 'cherry picking' concern. (*Id.* at 46:12–22.) The Court accepts this as a reasonable compromise between the parties' position and orders that Toyota deliver to Allen the specifications and photographs it seeks no later than the time of completion of the parts inspection.

## B. Recorded Facilities Inspection

Toyota also seeks to conduct a Rule 34(a)(2) inspection of Allen's facilities "to determine whether Allen's supply chain, quality control processes, handling, labeling, and

packaging are materially different than Toyota USA's, an issue that is clearly relevant to the relief sought by Toyota USA." (Pls.' Mem. in Supp. of Mot. to Comp. 13–18, Dkt. No. 293.) However, as discussed above, what matters in determining whether the parts are materially different for Lanham Act purposes is whether there are material differences between the parts themselves, not what may have caused those material differences, such as supply chain, quality control, or handling differences. (*See supra* section I.B.2.b.) Because these issues are not relevant, the Court denies Toyota's Motion to Compel a Rule 34(a)(2) inspection of Allen's facilities.

### C. Customer List De-Designation

Toyota asks the Court to change the confidentiality designation on Allen's customer list from "Attorneys Eyes Only" ("AEO") to "Confidential," and make the list available to certain people within Toyota itself. (Pls.' Mot in Supp. of Mot. to Comp. 21, Dkt. No. 293.) Allen argues that this request is an attempt by Toyota to relitigate this issue, as the Court already ruled that the customer list should be AEO. (Def.'s Mem. in Opp. to Mot. to Comp. 34, Dkt. No. 315.) Toyota argues that Allen does not have a good faith basis to oppose this request, that the Amended Protective Order adequately protects Allen from misuse by those within Toyota, and that it needs Toyota representatives to see the information to assist its attorneys with case preparation. (*Id* at 22.)

Allen argues that the Court has already decided that customer lists are appropriately classified as AEO, and to support that contention, Allen cites to the Court's discussion at the beginning of the Protective Order. (Dkt. No. 101.) In that discussion, the Court held that, generally, Toyota's outside counsel could not share AEO-designated information with

in-house counsel at Toyota and supported that conclusion with its fears that the particular in-house attorney it sought to include worked in a business division of Toyota directly aimed at pursuing gray marketers. (Protective Order 6, Dkt. No. 101.) The Court made no statement about the designation of certain documents as AEO. It does today. Allen's customer list produced in this case is properly designated as AEO material.

"[I]ssues pertaining to the production of confidential information to a direct competitor present a common problem for the Courts, and … the best solution to end the parties' dispute is to require the production of the [documents] subject to the Plaintiff's acceptance of an Attorneys' Eyes Only condition." *Tri-Mktg., Inc. v. Mainstream Mktg. Servs., Inc.*, No. CV 09-0013 (DWF/RLE), 2010 WL 11537450, at *5 (D. Minn. Feb. 16, 2010). Customer lists are some of the most sensitive pieces of information a company has, and providing access to those lists to a direct competitor provides the competitor an unfair advantage, that should be avoided where possible. This is especially true here, where from the outset of this litigation, the Court has had "apprehension about this case being used as an instrument for gathering corporate intelligence rather than settling a dispute between two parties." (February 22, 2024 Hr'g Tr. 31:24–32:1, Dkt. No. 139.) The fact that Toyota is yet again asking for sensitive business information to be made available to corporate representatives resurrects that apprehension. Accordingly, Toyota's motion to de-designate Allen's customer lists from AEO to Confidential is denied.

### D.  RFPs 63 and 64: Documents Regarding Counterfeit Parts[4]

---

[4]  Counterfeit parts are different from gray market parts in that counterfeit parts are imitations of Toyota parts manufactured by a third-party over which Toyota exercises no

Toyota asks the Court to compel Allen to produce documents responsive to its 63rd and 64th Requests for Production ("RFPs"), which seek "All communications to or from [Allen] mentioning, involving, relating to, or otherwise concerning counterfeit automotive parts since January 1, 2016, to the present," and "All documents Defendants reference or rely on in determining whether or not the TOYOTA BRANDED PARTS sold by Defendants are or are not counterfeit," respectively. (Pl.'s Mem. in Supp. Mot. to Compel 30–33, Dkt. No 293; Oct. 24, 2024 John Sear Decl. Ex. 14 at 5, Dkt. No. 296.) Toyota argues that these documents are relevant to Allen's claim challenging the veracity of Toyota's statements to dealers that counterfeit parts are often intermingled with gray market parts. (Pl.'s Memo. in Supp. Mot. to Compel 32–33, Dkt. No 293.) It also says that a 2018 email to a Toyota employee stating that counterfeit headlamps were delivered to Allen from a company in Dubai provides further support for its position. (*Id*. at 30.) Allen responds by saying that the documents are not relevant to a claim or defense in this case, and that if Toyota had concerns about potential counterfeit parts after receiving this email in 2018, it would have included a claim about counterfeit parts in its complaint, originally filed in 2022. (Def.'s Memo. in Opp. Mot. to Compel 39, Dkt. No. 315.) Allen also states that its documents have no relevance to whether Toyota's general statements about intermingling of gray market parts and counterfeit parts are true and that RFPs 63 and 64

---

control or oversight yet may bear reproductions of Toyota's branding. Gray market parts are parts whose manufacturing is controlled entirely by one of many Toyota manufacturing plants around the world and, at some point, leave a Toyota-approved supply chain before being sold, as relevant here, in the United States by a company unaffiliated with Toyota and outside of the Toyota-approved supply chain. Toyota often generally refers to both counterfeit and gray market parts as "non-genuine" parts.

are "a fishing expedition intended to muddy the water with an accusation whose negative effects are difficult to distinguish once the accusation is voiced." (*Id.*)

The Court agrees with Allen that, because counterfeit parts are not the subject of a claim or defense in this case, RFPs 63 and 64 seek information that is not relevant to its resolution. The logical chain from an email alleging that Allen once received a delivery of counterfeit headlamps to relevance to this case about gray market parts is a long one, in which Toyota's argument skips multiple important links. Toyota, in an effort to reduce the number of dealers buying from gray marketers, has told dealers that there is a risk that when one buys from gray marketers, counterfeit parts can be intermingled with gray market parts. In 2018, Toyota was notified, by an organization with which it contracted, that Allen had received a shipment of counterfeit headlamps. Now, six years after Toyota learned of the shipment and two years after Toyota filed suit in this gray market parts case, it seeks a new category of discovery: counterfeit parts. Toyota claims this is relevant because Allen generally contests the idea that gray marketers may intermingle counterfeit parts with Toyota-made, gray market parts.

Allen's disagreement with Toyota about the intermingling issue is not an issue in this case because Toyota, despite having information that Allen received a shipment of counterfeit parts, did not make a claim about counterfeit parts in the complaint. (Second Am. Compl., Dkt. No. 92.) Further, Allen does not include the statements Toyota cites in its counterclaim for antitrust and unfair competition violations. (Def.'s Answer and Counterclaim, Dkt. No. 99.) That Allen questions the veracity of Toyota's intermingling statements does not create sufficient relevance to open discovery in this case to counterfeit

21

parts. All Toyota has shown the Court is that Allen probably, once, took delivery of counterfeit headlamps. Accordingly, Toyota's Motion to Compel is denied as it applies to RFPs 63 and 64.

### E. RFPs 25–27: Photographs of Toyota-Branded Parts and Packaging

Finally, Toyota asks the Court to compel Allen to produce additional photographs of the Toyota-branded parts that Allen sells. (Pl.'s Mem. in Supp. Mot. to Compel 33–35, Dkt. No 293.) The parties agree that these photographs have already been taken and are in Allen's possession but disagree on the number of photographs that must be produced. Allen's main argument against production of a large number of additional photographs is mainly that production would be burdensome because of how Allen sorts its photographs. (Def.'s Memo. in Opp. Mot. to Compel 41, Dkt. No. 315.) It says that its photographs are taken in order to post parts on ecommerce sites like eBay and are not organized by manufacturer. (*Id*.) Because of this, photographs of individual parts will have to be identified individually. (*Id*.) It also argues that Toyota already has access to all of these photographs because they are publicly available on Allen's eBay stores. (*Id*.)

The Court is not convinced that any burden of producing these photographs is outweighed by the relevance of the photographs to the case. Allen's method of organizing its photographs does not bear on the discoverability of the photographs it has of the Toyota products it sells. "The fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information. A discoveree cannot avoid a proper discovery request by utilizing record keeping which

22

conceals rather than discloses." *Hogan v. Wal-Mart Stores E., LP,* No. 4:21-CV-78 RLW, 2022 WL 605225, at *7 (E.D. Mo. Mar. 1, 2022). Therefore, the Court will adopt as its order the compromise that Toyota proposes: Allen will produce "the first 200 photos of unique packaged parts and the first 50 photos of unique unpackaged (i.e., not boxed) parts taken each year from 2016 to the present." (Pl.'s Memo. in Supp. Mot. to Compel 35, Dkt. No 293.)

### III.   Allen's Omnibus Motion to Compel

Allen moves the Court to compel Toyota to produce a range of outstanding discovery, including: 1) any remaining dealer contact reports responsive to Allen's RFPs Numbers 10 and 15; 2) sales and profits information regarding the Toyota parts also sold by Allen; 3) more fulsome responses to Allen's Interrogatories Numbers 20 through 22; 4) more fulsome responses to Allen's RFPs 81 and 82; and 5) answers to Allen's Requests for Admission ("RFAs") Numbers 1, 2, and 9. (Def.'s Mem. in Supp. Mot. to Compel 1–4, Dkt. No. 283.) Allen also seeks to compel Toyota to enter a stipulation Toyota allegedly agreed to make in exchange for Allen not moving to compel certain dealership sale information.

#### A. Dealer Contact Reports

Allen renews a previous motion seeking dealer contact reports, or records of specific interactions between Toyota and its dealers. (Def.'s Mem. in Supp. Mot. to Compel 10–11, Dkt. No. 283.) The Court previously granted this request in part and denied it in part by granting Allen access to ten dealer contact reports and allowing Allen to renew this motion if those reports yielded information that would support additional discovery. (August 1,

2024 Order 10–11, Dkt. No. 224.) The Court limited Allen's access to these reports partially because Toyota stated that gray market parts are rarely, if ever, mentioned in them.

Allen states that in response to the August 1 order, the parties identified nine dealers that would be searched for responsive contact reports, and from those searches, Toyota identified five responsive reports from two of the nine dealers. (Def.'s Mem. in Supp. Mot. to Compel 11–15, Dkt. No. 283.) The responsive documents indicated that Toyota representatives were using these contacts to investigate and discuss dealer interactions with gray marketers, as Allen alleges. (*Id.*) At least two dealer contact reports provided by Allen showed that gray market parts are a major topic of discussion in these contacts that Toyota has with dealers, directly contradicting Toyota's argument to the contrary. One, dated November 24, 2014, discusses only gray market purchases in its "Contact Summary," stating that the Toyota representative visited the dealership because air filter and cabin air filter purchases by the dealership from Toyota were down significantly from the previous year and that "[t]his evidence gives reason to believe that grey market parts are being purchased and used on Toyota vehicles being serviced" at the dealership. (Decl. of Jeya Paul, Ex. 12 at p. 5, Dkt. No. 285-3.) The report goes on to state that the Toyota representative spoke to the dealership parts manager and "informed him that he is putting his dealership at risk if he purchases and uses these types of parts." (*Id.*) Another report states that a Toyota representative met with service and parts managers at another dealership because Toyota noticed that "the dealership has fewer purchases than warranty claims processed," indicating that it was not using "Genuine Toyota Motor Oil" in all of its oil services. (Decl. of Jeya Paul, Ex. 13 at p. 2, Dkt. No. 285-4.) It goes on to say that

"warranty and Toyota Care claims on vehicles where Genuine Toyota Motor Oil is not used are subject to debit." (*Id.*)

Toyota does not contest that the reports may be relevant but says that recovering them is burdensome because of the way that Toyota organizes contact reports within its database. (Pls.' Memo. in Opp. of Mot. to Compel 3–4, Dkt. No. 321.) Toyota states that "Toyota USA personnel expended approximately 85 working hours in order to search for and compile potentially responsive contact reports for the nine dealers previously ordered by the Court," which it says does not include attorney time spent reviewing the reports. (*Id.* at 4–5.) The Court accepts that performing these operations represents a significant commitment of employee and attorney time, considering that there are almost 1,500 Toyota and Lexus dealers in the United States and concludes that this burden is the chief barrier to finding the dealer contact reports to be discoverable. (*Id.*) However, "[t]he fact that a corporation has an unwieldy record keeping system which requires it to incur heavy expenditures of time and effort to produce requested documents is an insufficient reason to prevent disclosure of otherwise discoverable information. A discoveree cannot avoid a proper discovery request by utilizing record keeping which conceals rather than discloses." *Hogan v. Wal-Mart Stores E., LP,* No. 4:21-CV-78 RLW, 2022 WL 605225, at *7 (E.D. Mo. Mar. 1, 2022); *Webb v. Ethicon Endo-Surgery, Inc.*, No. CIV. 13-1947 JRT/JJK, 2015 WL 317215, at *7 (D. Minn. Jan. 26, 2015).

Despite what will be a significant burden on Toyota, the Court is persuaded by the holdings in *Hogan* and *Webb* and will grant in part Allen's Motion to Compel as to these reports, to an extent. The burden is significant because Toyota's record-keeping system is

designed the way it is, and that cannot be a barrier for Allen to fully develop its claims. Considering what has been discovered in the limited dealer contact reports that have been produced, the Court agrees with Allen that the information in these contact reports may have highly important information to Allen's antitrust and Lanham Act claims. The Court also agrees that "Allen Interchange is unlikely to obtain [the information] from other sources… [because,] given the value of a Toyota dealership, a dealer is unlikely to … provide testimony favorable to Allen Interchange about the reason it stopped purchasing gray market parts." (Def.'s Mem. in Supp. Mot. to Compel 13, Dkt. No. 283.) Accordingly, the Court will grant Allen's Motion to Compel as to the dealer contact reports in part and deny it in part. The amount of time Toyota will need to produce dealer contact reports for every Toyota and Lexus dealer in the country would extend discovery in this case far beyond any reasonable discovery deadline this Court could set. Allen will provide to Toyota a list of 250 dealerships for which it seeks responsive dealer contact reports, and Toyota will produce responsive documents. This number represents an amount that is large enough to provide Allen with the sample size it needs to develop its claims against Toyota while allowing the Court to retain control over the discovery timeline in this case. Toyota will not be required to produce any dealer contact reports from before 2016.[5] If this order

---

[5]  Toyota represented to the Court that the dealer contact report database exists in two locations: one for documents generated up to and including part of 2015 and the other for documents generated after a certain point in 2015. (Pls.' Memo. in Opp. of Mot. to Compel 4, Dkt. No. 321.) To ease the burden on Toyota, the Court only orders Toyota to produce documents from the latter location.

requires an extension to the fact discovery period, the parties will meet and confer, then file a new proposed scheduling order as soon as is practicable.

### B. Sales and Profit Information

Allen seeks sales and profit information related to Toyota's parts business, including sales of over 71,000 parts, responsive to its Interrogatory Number 17 and RFP Number 80. (Pls.' Mem. in Opp. of Mot. to Compel 10, n. 5, Dkt. No. 321.) This motion comes after the Court denied a similar motion by Allen (Def.'s Mot. to Compel Discovery, Dkt. No. 116), which asked the Court to compel Toyota to provide responses to the following interrogatory:

> 16. For each year from 2016 to present, identify the Toyota Parts (by part number) sold at a dealer net cost over $5.00, that ranked in the top 15% by yearly sales volume of parts sold to Toyota Dealers by TMS in TMS' PMA (based on sales in U.S. Dollars) and provide the following financial data relating to TMS's profits for each such Toyota Part by year from 2016 to present:
> a) TMS's annual sales volume (in dollars and by quantity);
> b) TMS's average cost of goods (COGS) sold;
> c) TMS's average sales price; and
> d) TMS's average net margin (revenue minus COGS and other costs allocated when calculating net profit for your business accounting records).

(Feb. 8, 2024 Decl. of Evan Nelson Ex. F, Dkt. No. 119-1.) In the August 1, 2024 order, the Court held that "[o]nly the sales of the falsely advertised products are relevant here. But Allen Interchange has failed to demonstrate how the limits it imposes—i.e., 'sold at a dealer net cost over $5.00' and 'rank[ing] in the top 15% by yearly sales volume of parts'— relate to the parts at issue." (August 1, 2024 Order 8, Dkt. No. 224 (citing *Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1244 (10th Cir. 2022)).)

With the current motion, Allen asks the Court to compel Toyota to respond to the following modified interrogatory and RFP:

> **INTERROGATORY NO. 17:** For the period October 1, 2016 to December 3, 2016, and then for each year from 2017 to present, provide the following financial data (by month and year) relating to your sales to Dealers in the United States for each Toyota Part listed on AIC_0000245 and each Toyota Part listed on lines 2 through 58,973 of TOY USA-00015540:
>     a) TMS's net sales volume (in dollars and by quantity);
>     b) TMS's average cost of goods sold (COGS);
>     c) Other than COGS, all other part specific or allocated costs when calculating net profit for your business accounting records;
>     d) TMS's average sales price;
>     e) TMS's average net margin (revenue minus COGS and other costs allocated when calculating net profit for your business accounting records);
>     f) TMS's net profit; and
>     g) TMNA's net profit.

> **RFP NO. 80:** Documents sufficient to show, and to calculate, for each part number by month and by year, from October 1, 2016 to present, TMS's net sales volume, revenues, costs (broken out by cost line item such as COGS, marketing costs, overhead, etc.), gross margin, net margin and profits for sales by you to Toyota Dealers in the United States for the Toyota Parts listed on AIC_0000245 and the Toyota Parts listed on lines 2 through 58,973 of TOY USA-00015540.

(Def.'s Mem. in Supp. Mot. to Compel 16–17, Dkt. No. 283.) This profit information, Allen claims, is relevant to the damages to which it may be entitled under the Lanham Act, which provides for disgorgement of profits. (*Id.* (citing *Watkins Inc. v. McCormick & Co., Inc.*, 574 F. Supp. 3d 644, 655 (D. Minn. 2021)).) Allen claims that this list is significantly more tailored than the request the Court denied in its August 1, 2024 Order because it is "limited [to] the part numbers for the Toyota Parts for which it sought this information to gray market parts." (*Id.* at 17.) The Court agrees that these new requests are more tailored, but

the request is still disproportionate (if less so than its August predecessor). The Court grants Allen's Motion to Compel as to these requests in part and denies it in part.

Allen represents that AIC_0000245 and TOY USA-00015540 are lists of parts "known to have gray market competition."[6] (*Id.*) AIC_0000245 lists Toyota parts sold by Allen from 2017 to 2023 ("Allen Toyota Parts List"), and TOY USA-00015540 lists all Toyota parts that Toyota has identified as having gray market competition ("Toyota Gray Market Parts List"). (Decl. of Jeya Paul ¶ 4, Dkt. No. 285.) In its August Order, the Court explicitly held that "Allen Interchange may seek only disgorgement of Toyota's profit on the parts that Allen Interchange does sell." (August 1, 2024 Order 13, Dkt. No. 224.) In accord with that ruling, the Court finds that Allen is entitled to discovery of Toyota's itemized profits from the parts on the Allen Toyota Parts List (AIC_0000245), but Allen is not entitled to further discovery of profits on the larger Toyota Gray Market Parts List (TOY USA-00015540). To appropriately limit discovery to that which is proportional, Toyota need only provide responses to Interrogatory Number 17, as amended by the Court below:

> **INTERROGATORY NO. 17:** For the period October 1, 2016 to present, provide the following financial data (by month) relating to your sales Dealers in the United States for each Toyota Part listed on AIC_0000245:
> a) TMS's net sales volume (in dollars and by quantity);
> b) TMS's average cost of goods sold (COGS);
> c) Other than COGS, all other part specific or allocated costs when calculating net profit for your business accounting records;
> d) TMS's average sales price;
> e) TMS's average net margin (revenue minus COGS and other costs

---

[6] Neither of these documents were made available to the Court, due to their size and format." (Decl. of Jeya Paul ¶ 4, Dkt. No. 285.) The court accepts Ms. Paul's characterizations of these documents as true, as they are not contradicted by Toyota.

allocated when calculating net profit for business accounting records);

f) TMS's net profit; and

g) TMNA's net profit.

Because a response to this interrogatory will provide Allen with all the information it needs to calculate damages, Toyota need not respond to RFP No. 80.

### C. Interrogatories Numbers 20–22

1. <u>Interrogatory Number 20</u>

Allen's Interrogatory Number 20 asks Toyota to "identify the total number of Toyota Parts shipped by you or for you to Toyota Dealers in the United States and the total number of Toyota Parts for which you received a 'dealer parts claim' broken down by the type of claim…" (Def.'s Mem. in Supp. Mot. to Compel 25, Dkt. No. 283.) Allen claims that this information is relevant and necessary to defend against Toyota's Lanham Act claims, which require that Toyota show that there are material differences between the Toyota parts that Allen sells and the Toyota parts sold through a Toyota-approved supply chain. (*Id*. at 26.) Allen says that *if* shipping differences are relevant in determining material differences, it must be able to compare Toyota's shipping damage rates with its own to prove that there are no material differences in their shipping practices. (*Id*. at 27.)

In discussing Allen's Motion for Protective Order above, the Court found that what matters in determining whether the parts are materially different for Lanham Act purposes is whether there are material differences between the parts themselves, not what may have caused those material differences, such as supply chain, quality control, or handling differences. (*See supra* section I.B.2.b.) In accord with that ruling, Allen's Motion to

Compel as to its Interrogatory Number 20 is denied as moot. Because Toyota cannot use the shipping practices of Allen and its suppliers to prove material differences between the products, Toyota's shipping damage rates are not relevant to contradict those arguments.

      2.    <u>Interrogatory Number 21</u>

Allen's Interrogatory Number 21 asks Toyota to identify, from 2016 to the present, "(a) the dollar value of warranty claims for which TMS paid out under the Limited Parts Warranty … for a Toyota Part installed by a Toyota Dealer as part of a non-warranty repair or sold by a Toyota Dealer to a third-party without an installation service, compared to (b) the total sales of Toyota Parts that year." (Def.'s Mem. in Supp. Mot. to Compel 31, Dkt. No. 283.) The parties agree that Toyota's responses to date are responsive to part (a) of the interrogatory but dispute whether Toyota must provide a response to part (b), the total sales value of parts sold. Allen argues that this information, a single numerical value, is important to show that the number of claims under the limited parts warranty is negligible, as is the amount of money paid out under it. (*Id*. at 29–30.) This argument arises in the parties' dispute over potential material differences between the warranties that accompany the parts if they are purchased from Allen or through a Toyota-approved supply chain. Allen's argument is essentially one about providing context for the warranty claims numbers that Toyota has provided.

Toyota argues that courts in similar cases have established material differences between parts from approved supply chains and gray market parts by looking at the existence or text of the respective warranties and have not required information about the rates at which parties actually pay out under the warranties. (Pls.' Mem. in Opp. of Mot. to

Compel 16–17, Dkt. No. 321 (citing *Kia Motors Am., Inc. v. Autoworks Distrib.*, No. 06–156 (DWF/JJG), 2009 WL 499543, at *4 (D. Minn. Feb. 26, 2009); *Heraeus Kulzer LLC v. Omni Dental Supply*, No. CIV.A. 12-11099-RGS, 2013 WL 3305284, at *6 (D. Mass. July 1, 2013); *Duracell U.S. Operations, Inc. v. JRS Ventures, Inc.*, No. 17 C 3166, 2018 WL 3920617, at *3 (N.D. Ill. Aug. 16, 2018); *Monahan Prod. LLC v. Sam's E., Inc.*, 463 F. Supp. 3d 128, 143 (D. Mass. 2020).) Toyota speculates that Allen seeks to argue that a minimal pay-out rate under Toyota's warranty would support Allen's argument that any difference in the warranties provided would be immaterial and cites to cases discussing that the threshold for a difference to be "material" for Lanham Act purposes is low. (*Id.* at 17–18.)

It is not this Court's responsibility to gauge whether a particular argument will successfully convince a jury on this or any other issue. Toyota's argument may end up being the successful one vis-à-vis material differences in the warranties offered by Allen and Toyota. This Court is also not charged with determining admissibility at trial of the evidence collected in discovery. On the limited issue of discoverability of Toyota's total sales revenue from parts, the Court finds that there is little to no burden on Toyota to produce the information and that Allen has made the threshold showing of relevance required to make the number discoverable. Allen's Motion to Compel as to its Interrogatory Number 21 is granted.

3.    Interrogatory Number 22

Allen's Interrogatory Number 22 asks Toyota to "Describe … [its] position on what the terms 'genuine,' 'Manufacturer Warranty,' and 'Toyota Quality Assured' mean such that

their inclusion on an Amazon page that includes an offer by Allen Interchange in the form shown in Paragraph 46 of the Second Amend[ed] Complaint is false or otherwise a violation of the Lanham Act." (Def.'s Mem. in Supp. Mot. to Compel 33, Dkt. No. 283.) Allen claims that with this request it seeks to gain a better understanding of the allegations made by Toyota and that such an understanding is important to its defense against Toyota's claims that Allen's posts on ecommerce sites like Amazon constitute "false advertising." (*Id*. at 34.) Allen cites several cases from the District of Minnesota accepting such contention interrogatories as valid and enforceable, if they ask for discoverable information. (*Id*.) This position is also supported by Rule 33(a)(2), which says that "an interrogatory is not objectionable merely because it asks for an opinion or contention that relates to … the application of law to fact, but the court may order that the interrogatory need not be answered until … some other time." Fed. R. Civ. P. 33(a)(2). Toyota characterizes this interrogatory as "odd," saying that its opinion "on the meaning of the words has no bearing on the proof necessary for the claims and defenses relevant to the cause of action." (Pls.' Mem. in Opp. of Mot. to Compel 19, Dkt. No. 321.)

There appears to be some significant misunderstanding between the parties about what Allen is seeking here, and that misunderstanding is a challenge to Court's ability to rule on this dispute. Toyota's brief stated that it was "attempting to meet and confer on this issue in advance of the November 7 hearing," (*id*. at 20) but the parties provided no additional information at the hearing. The Court believes this request to be asking Toyota why it believes that the terms "genuine," "Manufacturer Warranty," and "Toyota Quality Assured," as presented in the Amazon listing in ¶46 of the Second Amended Complaint

33

(Dkt. No. 92), constitute false advertising under the Lanham Act. This is an entirely reasonable question to ask, and the meaning of these terms will be of utmost importance at trial. Accordingly, Allen's motion to compel as to the definitions of these terms is granted, but as is the norm in civil cases in this District, these contention interrogatories need not be answered until the end of fact discovery.

### D. Requests for Production Numbers 81 & 82

#### 1.    RFP Number 81

Allen's RFP Number 81 seeks "All pictures accompanying or relating to parts damage claims, including the pictures for 'Damage and Manufacturing Defect' claims as referenced at TOY USA-00035133 and the pictures referenced at TOY USA-00116133." (Def.'s Mem. in Supp. Mot. to Compel 36, Dkt. No. 283.) As Allen states, "[t]he parties' dispute over RFP 81 is limited to the question of whether the only parts' damage relevant are for part numbers that Allen Interchange has sold." (*Id.*) Toyota characterizes this request as another attempt by Allen to access discovery to which it is not entitled because the only Toyota-approved parts relevant to Allen's claims are those that have a direct corollary to those that Allen has sold. (Pls.' Mem. in Opp. of Mot. to Compel 21–22, Dkt. No. 321.) The Court agrees. Allen's Motion to Compel as to RFP 81 is denied both because the unproduced material it seeks is irrelevant to Allen's claims and because Allen makes no argument about relevance or proportionality in its brief.

#### 2.    RFP Number 82

Allen's RFP Number 82 seeks "All documents relating to any Pricing Analytics or Pricing Analysis work Deloitte Development, including any Deloitte affiliate, performed

for Toyota … relating to captive parts and grey market parts…" (Def.'s Mem. in Supp. Mot. to Compel 38, Dkt. No. 283.) Allen alleges that this information was generated by Deloitte, a business consulting firm contracted by Toyota, in an effort to develop parts pricing strategies for captive parts that, when combined with Toyota's efforts to eliminate gray market competition, provide significant support for Allen's antitrust claims. (*Id.*) Toyota has produced a limited number of documents from Deloitte's pricing strategy work, and Allen says that those documents support its claim, but additional documents are required. (*Id.* at 40–42.) Toyota simply states that the Motion to Compel as to this request is premature and that Toyota is still gathering responsive documents. The Court is willing to accept Toyota's assertion that it continues to produce these documents, while stating that the Court sees merit in Allen's relevance and proportionality arguments. Like Allen's Motion to Compel as to RFP 81, the Court denies this portion of the motion without prejudice and encourages the parties to find a solution without further intervention from the Court.

### E. Requests for Admission

Allen also seeks more fulsome responses to three Requests for Admission ("RFAs"), to which it alleges Toyota has failed to adequately respond. (Def.'s Mem. in Supp. Mot. to Compel 43, Dkt. No. 283.)

### 1.    RFAs 1 & 2

The first two RFAs at issue seek admissions regarding Toyota's sales (or lack thereof) on various ecommerce platforms, such as Amazon and eBay. They ask Toyota to:

> <u>RFA No. 1</u>: Admit that Toyota Motor Sales, U.S.A., does not sell Toyota Parts on Amazon.
> <u>RFA No. 2</u>: Admit that Toyota Motor Sales, U.S.A., Inc. does not sell Toyota Parts on Amazon, eBay, or any comparable online platform available to the public.

(*Id.*) Toyota's response to RFA No. 1 explains that "Toyota USA does not conduct retail sales directly to end consumers on Amazon," and its response to RFA No. 2 states that "Based on the language of the Request, it is unclear, for example, whether this Request may include Toyota Parts sold by Toyota USA to Toyota and/or Lexus dealers and then sold to end-consumers on online platforms." In general, Toyota objects to the requests as not providing enough detail regarding their temporal and geographic scope to determine an adequate response, but Toyota's responses to these two RFAs generally give Allen more information than Allen requested and inflict no harm on Allen of any kind.

The Court generally agrees with Allen that Toyota's responses to RFAs Nos. 1 and 2 might be accurately described as "hair-splitting." Toyota's responses are certainly more verbose than were necessary and emphasize the distinction between Toyota and its Dealers as separate entities. However, Allen is the party that brought the motion here, and the Court can see no reason why it has. Toyota's response has given Allen more information than it asked for, but not so much information that it placed any real burden on Allen. If anything, the only additional cost to either party was brought on by Allen's decision to include this 'issue' in its Motion to Compel and the additional time spent by the parties and the Court addressing it. Allen's Motion to Compel as to RFAs 1 and 2 is denied as moot because

Toyota's response provides it with the information it needs to litigate the issues the RFAs sought to address.[7]

2.    RFA No. 9

RFA Number 9 asks Toyota to "Admit that the TMS Limited Parts Warranty has not covered Toyota Parts sold by Vintage Parts, Inc.," and Toyota has refused to provide a response beyond a wide array of objections. (Pls.' Memo. in Opp. of Mot. to Compel 28–29, Dkt. No. 321.) The core of Toyota's objections is a claim that RFA Number 9 is ambiguous because, until Allen's motion Toyota did not know whether "Allen is asking if the plain language of the warranty encompasses Toyota Parts sold by Vintage Parts or if Allen is asking whether, at any point in time, Toyota USA has honored or paid a warranty claim on a Toyota Part sold by Vintage Parts." (*Id*. at 29.) In its motion, Allen stated that "the plain language of RFA 9 asks whether the policy covers the parts and not whether TMS has made any kind of payment on a part sold by Vintage Parts." (Def.'s Mem. in Supp. Mot. to Compel 46, Dkt. No. 283.) Finally, Allen argues that "even if the language could be reasonably read in the ways the Toyota Parties posit (which it cannot), 'good faith' would require a qualified answer." (*Id*.) The Court agrees.

In its response to RFA Number 9, Toyota again engages in unnecessary hair-splitting, but this time without providing any substantive response whatsoever. The Court agrees that of the two potential readings that Toyota say make the RFA ambiguous, one is

---

[7] The Court feels this an appropriate time to ask both parties to reflect on the progress that has been achieved from the gallons of ink spelled in litigating discovery in this case and how much Court time and client money could have been avoided through a more collaborative approach.

37

reasonable, while the other is borderline inconceivable. The RFA clearly asks about coverage, not about payments. Allen is correct that "if the policy does not cover the parts, even if TMS had made a payment on a part that would not mean that the 'TMS Limited Parts Warranty' covered the part. It would just mean that TMS made a payment on a repair of a part." (*Id.*) The Court grants Allen's Motion to Compel as it applies to RFA No. 9 and orders Toyota to amend its answer to the RFA to be adequately responsive to the following question: Does the Limited Parts Warranty (as defined in the RFAs) cover parts sold by Vintage Parts to dealers in the United States?

### F. Stipulation Dispute

Finally, Allen moves the Court to compel Toyota to execute a document stipulating that "1) 'Toyota dealerships are valuable'; and 2) 'Most dealers abide by their obligations under their Toyota Dealer Agreements for many reasons, including a desire to retain and protect their dealerships.'" (Def.'s Mem. in Supp. Mot. to Compel 48, Dkt. No. 283.) In response to Allen's previous Motion to Compel Toyota's response to Allen's RFP Number 37,[8] (Dkt. No. 116) Toyota stated, "It is self-evident that dealers do not want to lose their Toyota franchise. Moreover, Toyota USA is willing to stipulate that Toyota dealerships are valuable. Moreover, Toyota USA would stipulate and agree that most dealers abide by their obligations under their Toyota Dealer Agreements for many reasons, including a desire to retain and protect their dealerships." (Pls.' Feb. 15, 2024 Memo. in Opp. to Def.'s Mot. to

---

[8] RFP 37 requested, "For each Toyota dealership in the U.S. that changed ownership since 2019, all documents reflecting that price of th[at] dealership, including any buy-sell packages and market rep packages." (Def.'s Mem. in Supp. Mot. to Compel 46–47, Dkt. No. 283.)

Compel 20, Dkt. No. 132.) In the Court's August 1, 2024 Order, it held that "In light of Toyota's representations and the request's overbreadth, the Court finds it overly disproportionate on its face and denies Allen Interchange's motion to compel (Dkt. No. 116) as to this document request." (August 1, 2024 Order 10, Dkt. No. 224.)

The Court's statement in the August 1 Order on this issue reflected the Court's conclusion that Toyota's stipulation was a reasonable compromise position between Allen's overly broad request seeking *all* documentation reflecting the price of *every* Toyota dealership sold after 2019 and Toyota's position, which was an objection to the request without any substantive response. As such, the Court relied on Toyota's proposed stipulation in denying Allen's motion as to that request. This stipulation has been the subject of two rounds of briefing, both in signed writings by Toyota's counsel, and two orders from this Court. However, the Court understands Allen's hesitation to rely on those writings and its efforts to seek something it knows it can present to a jury on this issue. Though the Eighth Circuit has held that court ordered stipulations are acceptable, *See United States v. Einfeldt*, 138 F.3d 373, 376 (8th Cir. 1998), the Court is hesitant to order a party to execute a written stipulation without another choice. Accordingly, the Court orders Toyota to deliver a signed copy of Allen's stipulation agreement document or all documents responsive to Allen's RFP 37 by January 31, 2025.

## CONCLUSION

Accordingly, based on the foregoing and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Allen Interchange LLC's Motion for Protective Order (Dkt. No. 253) is **GRANTED**;

2. Toyota Motor Sales, U.S.A., Inc., and Toyota Motor North America, Inc.'s Request for Letters Rogatory (Dkt. No. 302) is **DENIED**;

3. Toyota Motor Sales, U.S.A., Inc., and Toyota Motor North America, Inc.'s Motion to Compel (Dkt. No. 291) is **GRANTED IN PART** and **DENIED IN PART** as set forth in this Order;

4. Allen Interchange LLC's Motion to Compel (Dkt. No. 281) is **GRANTED IN PART** and **DENIED IN PART** as set forth in this Order.

Date: February 11, 2024                    *s/ John F. Docherty*
                                          JOHN F. DOCHERTY
                                          United States Magistrate Judge

40