## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Toyota Motor Sales, U.S.A., Inc., | No. 22-cv-1681 (KMM/JFD) |
| Plaintiff, | |
| v. | **ORDER ON ALLEN INTERCHANGE LLC'S PARTIAL MOTION TO DISMISS THIRD AMENDED COMPLAINT** |
| Allen Interchange LLC, et al., | |
| Defendants. | |

This matter is before the Court on Defendant Allen Interchange LLC's ("Allen") partial motion to dismiss Plaintiff Toyota Motor Sales, U.S.A., Inc. ("TMS") Third Amended Complaint. For the reasons that follow, the motion is denied. Further, because it is intertwined with the Court's decision on the motion to dismiss, the Court also overrules TMS's objection to Magistrate Judge John F. Docherty's discovery Order dated July 28, 2025.

## I.    BACKGROUND[1]

### *TMS's Parts Distribution and Trademark Use*

TMS is a California corporation with its principal place of business in Texas. It is the authorized importer and distributor of Toyota-branded parts for sale in the continental United States, including Alaska. TMS alleges that it is the exclusive authorized importer of Toyota parts that meet the following four criteria: (1) the parts are manufactured in accordance with TMS and Toyota Motor Corporation's ("TMC Japan") manufacturing standards; (2) they are distributed and

---

[1] The background facts relevant to this Order are drawn from TMS's Third Amended Complaint (Dkt. No. 439) unless stated otherwise. Because Allen argues that TMS fails to state a claim under Fed. R. Civ. P. 12(b)(6), the facts asserted in the complaint are taken as true for the purposes of this Order. *Brokken v. Hennepin Cnty.*, 140 F.4th 445, 450 (8th Cir. 2025) (citation omitted).

sold through TMS's authorized distribution chain; (3) they enjoy the protections of TMS's distribution chain specifications; and (4) they are intended for sale and use only in the United States. TMS refers to these as "Genuine Toyota Parts" throughout the complaint.

TMC Japan owns several registered trademarks (the "Toyota Marks") that are used in the United States in connection with the promotion, distribution, and sale of Toyota vehicles and Toyota-branded parts. TMC Japan granted TMS a license to use those trademarks in connection with its importation and distribution of Toyota parts. TMS acquired that license to use the Toyota Marks through a Toyota Importer Agreement with TMC Japan. (Decl. of Jeya Paul, Ex. 1, Dkt. No. 461.)[2] That contract gives TMS a non-exclusive right to use the Toyota Marks. (*Id.*) It also provides that TMS must monitor any infringement of the trademarks by a third party within TMS's territory, and, if TMS becomes aware of any infringement by a third party, it must inform TMC Japan of the details of the infringement and assist TMC Japan in taking steps to protect TMC Japan's rights in the marks as instructed by TMC Japan. (*Id.*) In addition, TMS alleges that it has invested significant time, money, and effort into ensuring that the parts it distributes meet internal quality standards.

TMC Japan's suppliers, located in various places around the world, manufacture the parts that TMS eventually distributes in the United States. TMS sells those parts to consumers through its authorized Toyota and Lexus dealers. TMS gives the authorized dealers the right to sell the parts it imports to U.S. customers. And the authorized dealers are required to perform warranty work using only parts that meet the criteria for so-called "Genuine Toyota Parts."

---

[2] Although TMS asserts that the Court should ignore the specifics of this agreement for purposes of the motion to dismiss, the agreement is clearly embraced by the pleadings. *See Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 791 (8th Cir. 2014) ("The contracts upon which a claim rests are evidently embraced by the pleadings.") (citation omitted and cleaned up).

### *Grey Market Parts*

The parts manufactured by TMC Japan's suppliers for sale abroad can be physically identical, or at least similar, to the parts that TMS imports and distributes in the United States. Nevertheless, TMS alleges that its so-called "Genuine Toyota Parts" have material differences from those sold outside this country. TMS asserts that any importation or use of such parts that are not part of its own distribution chain and under its control are "grey market" parts. When others sell such parts in the United States, consumers are likely to be confused about the parts' provenance and their association with TMS. According to TMS:

> Any part bearing the name Toyota or sold under any of the Toyota Marks that is not imported into the United States by [TMS] and is not authorized for sale or use in the United States is either counterfeit or a gray market good (a good that is intended and authorized only for sale outside the United States but purchased and imported by someone, without authorization, for sale within the United States) because of material differences that exist between it and a Genuine Toyota Part.

(Third Am. Compl. ("TAC") ¶ 32, Dkt. No. 439.)

The "material differences" between TMS's parts and grey market parts are varied. For example, the parts sold in the United States through TMS's authorized distribution chain have different warranties from those sold in other places around the world. If the conditions of the warranty that TMS provides are met, then the warranty will be honored at any of TMS's 1200 authorized dealers. The manufacturer's warranty that TMS provides does not apply to parts that are intended to be sold elsewhere but are nevertheless imported and sold in the United States by others.

Other grey market parts sold in the United States may also be packaged differently than TMS's so-called "Genuine Toyota Parts." These packaging differences include the palletization of larger shipments of parts to authorized dealers, where TMS requires the shipments to be made in

a steel cage, while importers of grey market parts do not. Grey market importers also do not package each part separately in an individual box using protective packaging material. In addition to the packaging differences, TMS alleges that grey market importers do not label their products in the same way that TMS does.

### *Allen's Importation of Toyota Parts*

Allen is a Minnesota limited liability company that has marketed and sold Toyota-branded parts within the United States. Allen began importing, distributing, promoting, and selling Toyota-branded parts after TMS had been using the Toyota Marks for some time. TMS alleges that Allen's Toyota brand parts are "non-genuine" either because Allen did not acquire them through an authorized first sale or because they are not intended for sale within the United States. (TAC ¶ 33.) Although TMS has demanded that Allen cease and desist its importation and distribution of Toyota-branded parts, Allen continues to distribute and sell its parts in the United States market.

TMS alleges that Allen's products are materially different from the "Genuine Toyota Parts" that TMS distributes. Allen's products allegedly differ in their appearance, condition, packaging, and labeling from TMS's Toyota parts. For example, Allen's parts are shipped on pallets wrapped in black shrink-wrap as opposed to in a protective steel cage. Some of Allen's packages contain insufficient protective packaging materials. And Allen's products have labels reflecting incorrect quantities or handwritten labels that differ from TMS's labeling.

Moreover, TMS alleges that Allen advertises and markets its products as being covered by a "manufacturer warranty," as being "Toyota Quality Assured," and as being the "same as your local dealer." (TAC ¶ 43.) But according to the complaint, Allen's products are not covered by any manufacturer's warranty and neither TMS nor TMC Japan assures their quality. Allen also markets and sells its products to authorized Toyota dealers, knowing that the dealers will sell or install

these parts in customers' vehicles even though they do not meet all the criteria for TMS's "Genuine Toyota Parts" and are not covered by TMS's express warranty.

TMS alleges that Allen's representations concerning the warranty for its parts have caused TMS harm. Authorized Toyota dealers allegedly use Allen's products in performing warranty work on customers' vehicles, which then results in TMS unknowingly covering the costs of such warranty repairs that it is not contractually obligated to pay. Within Minnesota and other states, TMS is required to pay its authorized dealers a statutorily mandated mark-up on all parts and labor the dealers provide when performing warranty work. (TAC ¶ 51 (stating that TMS "reimburses Authorized Dealers at what are essentially retail prices for parts and retail labor rates for warranty repairs").) If one of TMS's parts is used as a replacement part for a non-warranty (i.e., a repair where the customer is required to pay for the parts out of pocket), and an authorized dealer later replaces that part under TMS's manufacturer warranty, TMS must reimburse the authorized dealer for the part and the associated labor.

TMS alleges that when Allen's products are marketed and sold as "Genuine Toyota Parts" to authorized Toyota dealers, and then those parts are used in warranty repairs, TMS cannot determine whether the part used was one of TMS's "Genuine" parts as opposed to one of Allen's "non-genuine Toyota parts." (TAC ¶ 53.) Consequently, TMS ends up shouldering the costs of its dealers' work that involves Allen's grey market products.

Moreover, although Allen allegedly provides a warranty with its products, and guarantees that the scope and duration of the warranty will be equivalent to the warranty provided by TMS, Allen does not provide any way for the consumer to access its own warranty. Even if an authorized dealer may see Allen's warranty when the dealer receives a shipment of Allen's products, the owner of a Toyota vehicle does not. Allen does not make the terms of its warranty readily available

on any website or through any forms associated with its products. As a result, consumers are unable to make warranty claims or seek reimbursement under Allen's warranty. To the contrary, TMS provides consumers a toll-free phone number for submitting warranty claims and maintains an easily accessible website with that information.

TMS also alleges that Allen relies on unauthorized and unsecure supply chains to obtain the Toyota parts that it imports and sells in the United Staes. Allen procures parts from middle-men or "jobbers" that do not have any apparent relationship with any Toyota company. (TAC ¶ 67.)

> [T]here are numerous entities in [Allen's] supply chain of non-genuine Toyota parts that have no affiliation with [TMS], [TMC Japan], or any other entity authorized by [TMC Japan] to buy and sell parts bearing the Toyota Marks. Moreover, [Allen's] Products do not move through the same supply chain and are not subject to the same protections and quality control measures as Genuine Toyota Parts imported, distributed, and sold by [TMS].

(*Id.*) This allegedly prevents TMS from controlling the quality of Toyota parts and the warranties sold in the United States and creates confusion as to the origin of Allen's products.

### Allen's Alleged Interference with TMS's Agreements

Finally, TMS alleges that Allen has intentionally interfered with and procured the breach of TMS's agreements with its authorized dealers. TMS is a party to a Toyota Dealer Agreement with all authorized dealers of Toyota vehicles in the continental United States except in certain states.[3] Similarly, TMS is a party to a Lexus Dealer Agreement with all authorized U.S. dealers of Lexus brand vehicles. Allen has allegedly known of the existence of these agreements and is aware that the agreements prohibit authorized Toyota and Lexus dealers from buying grey market parts

---

[3] These states are Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, and Texas.

and other non-genuine Toyota parts. Nevertheless, Allen allegedly solicited TMS's authorized dealers to breach their contracts with TMS by purchasing such parts from Allen.

An example of one version of the Toyota Dealer Agreement and the contract's Standard Provisions can be found in the record. (Dkt. No. 36-1.) This initial dealer agreement provides that an authorized dealer will only use TMS's "Genuine Toyota Parts" for any warranty repairs unless TMS gives advance approval in writing. However, it allows an authorized dealer to use parts that are not TMS's "Genuine Toyota Parts" for non-warranty repairs. According to the parties' briefing on Allen's motion to dismiss, TMS has a newer version of its standard dealer agreement that prevents authorized dealers from purchasing Toyota parts from anyone other than TMS.[4]

### *TMS's Claims*

Based on these alleged facts, TMS brings seven causes of action in its Third Amended Complaint. In Counts 1 and 2, TMS asserts claims for trademark infringement and false designation of origin and unfair competition under 15 U.S.C. § 1125(a).[5] Count 3 is a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B). In addition to these federal claims, TMS asserts Minnesota state law claims of tortious interference with contract (Count 4); unjust enrichment (Count 5); violations of the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat.

---

[4] Unlike the initial dealer agreement, the parties have not pointed the Court to a copy of the newer version of the dealer agreement in the record. Like the contract between TMC Japan and TMS, the initial dealer agreement at docket entry 36-1 is plainly embraced by the pleadings and can be considered for purposes of Allen's motion to dismiss. *See* note 2, *supra*.

[5] Section 43(a) of the Lanham Act is codified as 15 U.S.C. § 1125(a). Claims for trademark infringement or false designation of origin under Section 43(a)(1)(A) are sometimes referred to collectively as "false association" claims. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). Section 32(1) of the Lanham Act also provides a cause of action for trademark infringement, and that provision is codified in 15 U.S.C. § 1114(1). Cases discussing these provisions often switch between the Lanham Act section numbers and those found in the United States Code.

§ 325D.44 (Count 6); and violations the Minnesota Unlawful Trade Practices Act ("MUPTA"), Minn. Stat. § 325D.13 (Count 7).

## DISCUSSION

Allen moves to dismiss all claims in the Third Amended Complaint, except the false advertising claim in Count 3. As explained below, the Court finds that the challenged claims are all adequately pled and denies the motion to dismiss.

## I.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Christopherson v. Bushner*, 33 F.4th 495, 499 (8th Cir. 2022). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Dalen v. Harpstead*, 123 F.4th 900, 904–05 (8th Cir. 2024).

## II.  Lanham Act

Section 43(a)(1)(A) of the Lanham Act provides for a cause of action for trademark infringement and false designation of origin. It states:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name,

symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities[]

. . .

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).[6]

"These claims require proof of trademark ownership and the alleged infringer's use of the mark 'in connection with goods or services in a manner likely to cause customer confusion as to the source or sponsorship of the goods or services.'" *Abbott Labs. v. Revitalyte LLC*, 744 F. Supp. 3d 894, 902–03 (D. Minn. 2024) (quoting *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1040 (D. Minn. 2015)). In addition, and as explained in more detail below, a plaintiff must have "statutory standing" to be entitled to bring a claim under Section 43(a).

### A. Statutory Standing[7]

Allen first argues that Count 1 of TMS's complaint for trademark infringement under Section 43(a)(1)(A) should be dismissed because TMS lacks statutory standing to assert TMC

---

[6] *See also* 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 27:13, *Outline of claim under § 43(a) for trademark infringement* (5th ed. May 2025 Update) (listing elements of a claim under Section 43(a)(1)(A)).

[7] The issue of "statutory standing" addressed by the parties' briefing and the cases cited therein is not an issue of the plaintiff's standing to bring a claim under Article III of the Constitution and does not implicate the Court's subject-matter jurisdiction. *See Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012); *McHugh v. Bank of New York Mellon as Tr. for Certificate Holders of CWABS, Inc. Asset-Backed Certificates, Series 2007-8*, No. 21-cv-2174 (JRT/JFD), 2022 WL 4226208, at *3 n.4 (D. Minn. Sept. 13, 2022) ("The Court notes that Article III's constitutional standing requirements are separate and distinct from statutory standing considerations.") (citing *Lexmark Int'l, Inc.*, 572 U.S. at 128 n.4).

Japan's trademarks. Because TMS is neither the owner nor the exclusive licensee, distributor, or importer of Toyota parts, Allen contends that the Section 43(a) claim for trademark infringement fails to state a claim. (Def.'s Mem. 13–14, Dkt. No. 458.)

"Statutory standing is simply statutory interpretation: the question it asks is whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012) (quoting *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) (cleaned up). If a plaintiff in a particular case does not "fall within the class of plaintiffs whom Congress has authorized to sue" under a statute, the complaint may be dismissed for failure to state a claim. *Tovar v. Essentia Health*, 857 F.3d 771, 774 (8th Cir. 2017) (quoting *Lexmark*, 572 U.S. at 128).

Section 43(a) creates a civil action for trademark infringement and false advertising that can be pursued "by any person who believes that he or she is likely to be damaged" by the confusing and deceptive conduct the statute prohibits. 15 U.S.C. § 1125(a). In *Lexmark*, the Supreme Court addressed the question of which class of plaintiffs fall in the group that Congress authorized to bring a suit for false advertising under Section 43(a)(1)(B). Although the "broad language [of § 1125(a)] might suggest that an action is available to anyone who can satisfy the minimum requirements" of constitutional standing, the *Lexmark* Court found that the scope of statutory standing for a false-advertising claim under Section 43(a)(1)(B) is somewhat more limited. 572 U.S. at 129. The Court then considered a "zone of interests" test that "applies to all statutorily created causes of action." *Id.* Based on that test, the Court held that "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 131–32. Although *Lexmark* specifically addressed statutory standing for a claim under Section 43(a)(1)(B), courts have evaluated whether

plaintiffs asserting Section 43(a)(1)(A) claims have statutory standing by conducting the same inquiry into the nature of the plaintiffs' commercial interest. *See, e.g.*, *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 707–12 (4th Cir. 2016); *Adidas America, Inc. v. Thom Browne Inc.*, 599 F. Supp. 3d 151, 162 (S.D.N.Y. 2022); *Hotaling & Co., LLC v. LY Berditchev Corp.*, No. 20-cv-16366, 2021 WL 3783260, at *3–5 (D.N.J. Aug. 26, 2021). This Court will do so as well.

Having reviewed the Third Amended Complaint, the Court finds that TMS has alleged a commercial interest in its reputation and sales that could be harmed by the sale of parts bearing the Toyota Marks. As alleged, TMC Japan granted TMS a license to use the Toyota Marks in the continental United States, and TMS is the exclusive importer of Toyota branded parts. The complaint asserts that TMS acts as TMC Japan's distributor within the continental United States. These allegations plausibly allege that TMS has statutory standing to bring its Section 43(a) claims.

Nevertheless, Allen argues that statutory standing is lacking because TMS does not allege that it is the *exclusive* licensee, importer, or distributor. (Def.'s Mem. 13–14.) For several reasons, the Court disagrees that this is a sound basis for dismissal under Rule 12(b)(6). First, the Court notes that Allen does not point to any controlling precedent holding that a party with commercial interests in trademarks akin to those possessed by TMS lacks statutory standing under Section 43(a). And while it is true that TMS does not allege it has an exclusive license to use the Toyota Marks,[8] Allen acknowledges that some cases have allowed both exclusive importers and distributors to assert a claim under Section 43(a).[9] (Def.'s Mem. 14.) Relevant cases indicate that statutory standing under Section 43(a) is not limited to the owner of a mark or its exclusive

---

[8] The agreement between TMC Japan and TMS states that TMS received "a non-exclusive right to use [the Toyota Marks]" in its defined territory. (Paul Decl., Ex. 1, Art. 7(a), Dkt. 460.)

[9] Although Allen states that it "disputes that an exclusive distributor or importer has standing for a Section 43(a) claim" (Def.'s Mem. 14 n.7), it does not support this assertion with citation to authority. Therefore, the Court declines to address that issue.

licensee. *See, e.g.*, *Mercedes-Benz USA, LLC v. ATX Gr., Inc.*, No. 08-cv-3529 (WHW), 2009 WL 2255727, at *9 (D.N.J. July 27, 2009) ("Courts have found that § 1125(a)(1)(A)'s permissive rule that 'any person who believes that he or she is or is likely to be damaged by such an act' may sue permits claims by non-exclusive licensees.") (citations omitted). And other courts have found statutory standing for plaintiffs to sue under Section 43(a) where they are exclusive distributors or importers. *Adidas America, Inc.*, 599 F. Supp. 3d at 162 (stating that "[a] non-registrant party, such as a distributer, can provide that it has standing under section 43(a) by showing that it has a valid commercial interest in the mark" and finding that the "principal distributor in the United States" of the trademark owner's branded merchandise had standing to sue); *Hotaling & Co., LLC*, 2021 WL 3783260, at *1, *3–5 (finding statutory standing under Section 43(a) for an exclusive importer and exclusive distributor); *Master Saddles Inc. v. Taylor*, No. 3:20-cv-3709-B, 2021 WL 1814697, at *4 (N.D. Tex. May 6, 2021) (finding that Section 43(a) provides statutory standing to exclusive distributors) (citing *Martin's Herend Imports v. Diamond & Gem Trading USA*, 112 F.3d 1296, 1301 n.10 (5th Cir. 1997)).

Second, the Court disagrees with Allen that TMS has failed to allege that it has any exclusive rights to act as a distributor and an importer. In fact, TMS explicitly alleges that "[s]ince 1957, [it] has been the exclusive authorized importer of . . . Toyota motor vehicles and Toyota-branded automotive parts and accessories. . . ." (TAC ¶ 13.) This allegation finds further support in the agreement between TMS and TMC Japan. (Paul Decl., Ex. 1, Art. 10(a), Dkt. 460 (stating that TMC Japan grants TMS "an exclusive importership").) With respect to TMS's distributorship, Allen suggests that it lacks the requisite exclusivity because the complaint alleges that third parties act as distributors in eleven states and in other U.S. territories. But the Complaint alleges that TMS is "the authorized importer and distributor of Toyota-branded parts for sale in the continental

United States, including Alaska" (TAC ¶ 3), and TMS asserts that the third-party distributors identified in the complaint "obtain[ed] their rights to distribute Toyota-branded parts directly and solely from TMS," (Pl.'s Opp'n 12, Dkt. 456).

Finally, the Court is not persuaded by Allen's suggestion that TMS could not have standing to sue as an exclusive importer of Toyota-brand parts because it does not have distributorship rights in Hawaii and territories like Guam. Allen does not cite any authority to support the proposition that an otherwise exclusive importer lacks a commercial interest sufficient to assert a claim under Section 43(a) simply because its rights don't cover certain political subdivisions of the United States that fall outside its defined, exclusive territory.

For these reasons, Allen's motion to dismiss TMS's Section 43(a) trademark claims for lack of statutory standing is denied.

### B. Registered v. Unregistered Marks

Allen next argues that TMS bases its trademark infringement claims solely on TMC Japan's federally registered trademarks and does not assert infringement of any unregistered marks. According to Allen, this dooms TMS's Section 43(a) claims because that provision only applies to unregistered marks. (Def.'s Mem. 15–18.) While it is true that the only Toyota Marks identified in the Third Amended Complaint are registered trademarks held by TMC Japan and licensed to TMS,[10] as explained below, the Court finds that this does not require dismissal of TMS's claims.

---

[10] In its briefing on the motion, TMS does not argue that it is, in fact, asserting any unregistered trademarks. As a result, and based on the Court's reading of the Third Amended Complaint, the Court construes TMS's Section 43(a) claim to be based only on alleged infringement of the registered trademarks held by TMC Japan that TMS has a license to use.

The Lanham Act indeed contains separate provisions under which parties can bring claims based on the unauthorized use of a trademark. Section 32(1) allows the "registrant" of a federally registered trademark to bring a civil action against any person who uses that mark in commerce without the registrant's permission. 15 U.S.C. § 1114(1). While Section 43(a) does not specifically refer to a "trademark" or a "mark," courts have noted that it protects against infringement of unregistered trademarks. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). And courts have indicated that the standards for claims under these two provisions of the Lanham Act are essentially the same. *See id.* ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration . . . are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)."); *Island Insteel Sys., Inc. v. Waters*, 296 F.3d 200, 206 n.1 (3d Cir. 2002); *C.M.B. Prods., Inc. v. SRB Brooklyn, LLC*, No. 19-cv-2009 (ENV)(CLP), 2022 WL 2704506, at *9 (E.D.N.Y. July 12, 2022). Registration of a mark is a prerequisite to a claim under Section 32(1) of the Lanham Act, but plaintiffs suing under Section 43(a) are not required to show that they have a registered mark. *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985). On these basic principles, the parties appear to agree.

However, Allen argues that Section 43(a) exclusively concerns *unregistered* marks and cannot be used by a plaintiff to assert infringement of a registered mark. Allen points to cases that have described Section 43(a) and Section 32(1) as creating separate causes of action, respectively, for unregistered and registered trademarks, though those cases do not expressly hold that Section 43(a) can *only* be used to assert infringement of unregistered marks. *See, e.g.*, *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 72 (2d Cir. 2013). Allen points to no controlling case reflecting such a holding. Indeed, the two Supreme Court cases cited by Allen did not address

whether a Section 43(a) claim could be based on alleged infringement of a registered mark. *See Two Pesos*, 505 U.S. at 767 (holding that trade dress that is inherently distinctive "is protectible under § 43(a) without a showing that it has acquired secondary meaning") (footnote omitted); *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) (concluding that the phrase "origin of goods" in § 43(a) refers to "the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"). The passing references in *Two Pesos* and *Dastar Corp.* to Section 43(a)'s protection for unregistered marks cannot be read to foreclose claims based on registered marks.

In fact, there are cases—including from within this District—that indicate Section 43(a) can be used to assert trademark claims based on federally registered marks. *E.g.*, *Philip Morris USA Inc. v. Lee*, 549 F. Supp. 2d 839, 848 (W.D. Tex. 2008) (evaluating merits of infringement claim for a registered trademark under both Sections 32(1) and 43(a)); *Metro. Area Agency on Aging, Inc. v. Trellis Co.*, No. 24-cv-1854 (DWF/TNL), 2024 WL 5158482, at *3 (D. Minn. Dec. 18, 2024) (stating that 15 U.S.C. § 1125(a) "applies to both registered marks and common law marks"); *Plasti Dip Int'l Inc. v. Rust-Oleum Brands Co.*, No. 14-cv-1831 (JRT/SER), 2014 WL 7183789, at *2 (D. Minn. Dec. 16, 2014) (evaluating claim of infringement under § 1125(a) for the plaintiff's registered mark) (citing *Matal v. Tam*, 582 U.S. 218, 225 (2017)). Allen correctly points out that these cases do not specifically explore whether a plaintiff can assert infringement of a registered mark under Section 43(a). But neither does the caselaw Allen cites "confirm that

Section 43(a) is limited to unregistered marks that would be registrable." (Def.'s Mem. 16.)[11] Allen points to no authority supporting its argument for dismissal.

Allen next argues that "the plain language of the statute itself confirms that a plaintiff cannot assert registered marks under § 1125(a)(1)(A)" because that subsection does not reference a "trademark" or a "mark." (Def.'s Mem. 16–17.) The Court disagrees with Allen's reading of this language. By its terms, Section 43(a)(1) does not expressly exclude registered marks from its protections; instead, it applies to "*any* word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . ." 15 U.S.C. § 1125(a)(1) (emphasis added). The unambiguous language is certainly broad enough to encompass the registered Toyota Marks at issue in this case.[12]

For these reasons, the Court will not dismiss TMS's Section 43(a) infringement claim because it asserts registered trademarks. Allen's motion to dismiss is, therefore, denied with respect to Count 1 of the Third Amended Complaint.

### C. Duplicative False Designation of Origin Claim

Allen next moves to dismiss Count 2 of TMS's complaint, which also arises under Section 43(a) and is labeled "False Designation of Origin and Unfair Competition." (TAC ¶¶ 86–92.) TMS

---

[11] The cases Allen cites stand for the point that a plaintiff bringing a trademark infringement claim under Section 43(a) based on an unregistered mark is required to demonstrate that the mark is protectable. *E.g.*, *Adam Techs. LLC v. Well Shin Tech. Co., Ltd.*, No. 18-cv-10513, 2020 WL 2125007, at *2 & n.4 (D.N.J. May 5, 2020) (dismissing claim where plaintiff failed to allege that "any part of the product [at issue] could constitute a valid and legally protectable mark"); *Bangkok Bangkok Imp. & Exp. Inc. v. Jamtan Afr. Am. Mkt. Corp.*, No. 16 Civ. 2657 (CM), 2016 WL 8814348, at *4 (S.D.N.Y. June 17, 2016) (similar).

[12] Further, Allen contends that an interpretation of Section 43(a) permitting the assertion of registered trademarks would render Section 32(1) superfluous. (Def.'s Mem. 16–17.) But Allen's argument does not explain why Congress could not intend to provide separate avenues for different plaintiffs having different interests in a registered mark to bring suit. If, as Allen suggests, Section 43(a) is intended to apply only to unregistered marks, it is for Congress to say so, not for this Court to rewrite the statute through statutory construction.

claims that Allen's "use and threatened continued use of names and marks that are identical or nearly identical to the Toyota Marks constitutes a false designation of origin and a false description and representation of [Allen's] business and products." (TAC ¶ 88.)

Allen argues that Count 2 must be dismissed because it does not assert any permissible claim beyond the trademark allegations covered by Count 1. (Def.'s Mem. 18–19.) Again, the Court disagrees. To state a false-designation-of-origin or unfair-competition claim under Section 43(a), TMS "must allege that the materials used created a likelihood of confusion, deception or mistake on the part of the consuming public, and that [Allen] falsely designated the origin of a product." *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 768 (D. Minn. 2022) (cleaned up). Such claims, like trademark infringement claims, can arise from a defendant's use of a mark that is likely to cause customer confusion about the source of the goods being sold. *Abbott Labs.*, 744 F. Supp. 3d at 902–03 (D. Minn. 2024) (explaining that claims of trademark infringement and false designation of origin both "require proof of trademark ownership and the alleged infringer's use of the mark 'in connection with goods or services in a manner likely to cause customer confusion as to the source or sponsorship of the goods or services'") (quoting *Zerorez Franchising Sys., Inc.*, 103 F. Supp. 3d at 1040).

In support of the argument that the Court should dismiss the false designation of origin claim in Count 2 because it is essentially duplicative of the trademark infringement claim in Count 1, Allen cites *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220 (3d Cir. 2017). But *Parks LLC* is inapposite. There, the court observed that a significant difference exists between what a plaintiff is required to prove to prevail on a false association claim under Section 43(a)(1)(A) and the elements of a false advertising claim under Section 43(a)(1)(B). *Id.* at 226. For a false advertising claim, a plaintiff is not required to provide proof of secondary meaning—"a term of art in

17

trademark law that refers to a 'mental association in buyers' minds between the alleged mark and single source of the product.'" *Id.* (quoting 2 McCarthy on Trademarks § 15:5). But for a false association or trademark infringement claim under Section 43(a)(1)(A), the plaintiff must show that the mark is protectable, and in some cases, proof of secondary meaning is required. *Id.* The *Parks LLC* court explained that because of the less onerous requirements for a false advertising claim "litigants may be tempted to frame a false association claim as a false advertising claim, to ease their evidentiary burden." *Id.* (citation omitted). Because the plaintiff asserted a false advertising claim that was "essentially a false association claim in disguise," the *Parks LLC* court affirmed the dismissal of the false advertising claim. *Id.* at 226–27. Here, however, Allen is not moving to dismiss TMS's false advertising claim under Section 43(a)(1)(B) (which is found in Count 3 of the complaint) as duplicative of its false association claim under Section 43(a)(1)(A). And unlike the plaintiff in *Parks LLC*, there is no indication that TMS is attempting to disguise the claim in Count 2 as a cause of action with a lower standard of proof. Therefore, the Court finds *Parks LLC* does not support dismissal of TMS's false designation of origin claim. If it turns out that there is, in fact, no daylight between the claims set out in Count 1 and Count 2, such a duplication can be addressed by the parties in the context of summary judgment or, if necessary, at trial.

### D. Alternative Request to Limit the Scope of the Lanham Act Claims and TMS's Appeal/Objection to the Nondispositive Order

Finally, Allen argues that if Counts 1 and 2 are not dismissed, the Court should issue an order that limits those claims. According to Allen, the parties have litigated this case for three years as a "gray market" parts case. By that, Allen means that the parties have consistently assumed that Allen acquired Toyota parts through legitimate channels, such as purchasing the parts from authorized Toyota distributors in foreign markets. The parties have further assumed that Allen then

18

sells those parts in the United States, but without permission from TMS and without being subject to the conditions TMS imposes in its own U.S. distribution chain. However, in TMS's Third Amended Complaint, Allen says that TMS improperly attempts to inject a new "black market" theory of trademark infringement—namely, that Allen acquired its Toyota parts through illegitimate "black market" channels. Allen asserts that TMS's black-market theory should be kept out of the litigation because: (1) the theory contradicts TMS's own judicial admissions made earlier in this case; and (2) the Third Amended Complaint fails to plausibly allege the possibility of theft or other diversion that would negate Allen's acquisition of parts through an authorized first sale. (Def.'s Mem. 29–31.) The Court is not persuaded by either argument and declines to limit TMS's claims as Allen requests.

### *Judicial Admission*

First, Allen has failed to show that TMS's so-called black-market theory contradicts binding judicial admissions TMS made earlier in the litigation. A judicial admission is "a formal admission before a court that acts as a substitute for evidence in that it does away with the need for evidence in regard to the subject matter of the judicial admission." *Warner Bros. Ent., Inc. v. X One X Prods.*, 840 F.3d 971, 978 (8th Cir. 2016) (citation and internal quotation marks omitted). To constitute a judicial admission, a party's statement must be "deliberate, clear, and unambiguous." *Acciona Windpower N. Am., LLC v. City of W. Branch, Iowa*, 847 F.3d 963, 968 (8th Cir. 2017) (citation and internal quotation marks omitted). The focus on the inquiry is whether the party making the statement at issue intended to make the admission that the party's opponent attributes to it. *See id.* (agreeing with the district court's finding that the plaintiff's statement was not a judicial admission because the plaintiff "may have been imprecise with a term of art but did not intend to admit" a fact that would doom its claim).

19

Here, Allen asserts that TMS admitted that this case involves only "gray market" parts and that Allen acquired all the parts it sells in the United States through an authorized first sale when it filed its Answer to Allen's Amended Counterclaim. Specifically, in Paragraph 92 of the Counterclaim, Allen alleged as follows:

> While the Toyota Parts sold by Allen Interchange do not differ from those sold by TMS in design, function, or quality, they differ in price. TMS sells Toyota parts in the United States at prices substantially higher than those charged by Toyota in other places. Allen Interchange buys Toyota Parts injected into the stream of commerce by Toyota through an initial sale outside the United States and resells them to Toyota Dealers and others in the United States at prices significantly lower than TMS's. Allen Interchange thus competes with TMS, making it harder for TMS to keep its prices for Toyota parts as high as possible in the United States market.

(Dkt. No. 99 ¶ 92.) In response, TMS stated:

> Toyota USA admits that Allen Interchange buys Toyota-branded parts injected into the stream of commerce through an initial sale outside the United States and resells them to Toyota Dealers and others in the United States. Such parts are gray market goods. Toyota USA lacks knowledge or information sufficient to answer any remaining allegations contained in Paragraph 92 of the Counterclaim, and therefore, denies those allegations.

(Dkt. No. 102 ¶ 16.) Properly construed, TMS admitted only that Allen, in fact, acquires Toyota parts through a sale outside the United States and resells those parts in the United States. This is not an admission that every Toyota part that Allen acquires is obtained in that manner. Nor is it an admission that every Toyota part that Allen obtains enters the stream of commerce with the blessing of a Toyota entity. TMS's response to Paragraph 92, therefore, does not constitute a deliberate, clear, and unambiguous admission by TMS that Allen's purchase of goods abroad was authorized by Toyota or even that it was Toyota that purposefully injected the parts at issue into the stream of commerce.

Moreover, Allen filed a Second Amended Counterclaim on February 27, 2025. (Dkt. No. 362.) Paragraph 97 of Allen's Second Amended Counterclaim mirrors Paragraph 92 of the Amended Counterclaim. On June 11, 2025, TMS filed its Answer to Allen's Second Amended Counterclaim, and TMS denied that Allen purchases Toyota parts "injected into the stream of commerce by Toyota through an initial sale outside the United States." (Dkt. No. 489 ¶ 97.) TMS admitted that Allen purchases *some* Toyota parts from Toyota's foreign suppliers, but TMS denied "that each and every part sold by Allen Interchange was subject to an authorized first sale." (*Id.* (footnote omitted.) Consequently, even if TMS's response to the Amended Counterclaim could have constituted a judicial admission, it has been superseded by the answer to the Second Amended Counterclaim. *See Mo. Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990) (explaining that admissions in pleadings constitute binding judicial admissions unless those admissions are withdrawn or amended).

### *Asserted Pleading Insufficiency*

The Court also finds Allen's argument that TMS has failed to plausibly allege the absence of an authorized first sale unpersuasive. Allen argues that the Third Amended Complaint is devoid of facts supporting the possibility that Allen acquired parts from foreign suppliers that were stolen or otherwise diverted from Toyota's supply chain in illegitimate ways. But the Court disagrees. Specifically, the Third Amended Complaint alleges:

> Defendants also rely on unauthorized and unsecure supply chains to obtain their non-genuine Toyota parts imported and sold into the United States. Based upon evidence disclosed so far in this litigation, Defendants procure their parts from middle-men or "jobbers" having no apparent relationship with any Toyota entity. On information and belief, there are numerous entities in Defendants' supply chain of non-genuine Toyota parts that have no affiliation with Toyota USA, Toyota Motor Corporation, or any other entity authorized by Toyota Motor Corporation to buy and sell parts bearing the Toyota marks. Moreover, Defendants' Products do

21

> not move through the same supply chain and are not subject to the
> same protections and quality control measures as the Genuine
> Toyota Parts imported, distributed, and sold by Toyota USA.

(TAC ¶ 67.) These allegations support an inference that the Toyota parts sold by Allen do not all

enter the stream of commerce through a first sale authorized by TMC Japan or any other Toyota

entity. Rule 12(b)(6) does not support cabining the scope of TMS's claims given these allegations.

### *TMS's Appeal/Objection of Discovery Order*

Allen's effort to have the Court limit the scope of TMS's trademark claims intersects with

the parties' disagreements concerning the scope of permissible discovery sought by TMS in this

litigation. Specifically, TMS has sought discovery regarding Allen's suppliers and Allen's possible

sale of counterfeit parts. On several occasions, TMS has sought to compel information regarding

Allen's suppliers, and generally, Magistrate Judge John F. Docherty has allowed only limited

discovery on this subject. Judge Docherty has done so in an effort to balance TMS's need for

discovery of relevant information with concerns that TMS could use detailed information

regarding those suppliers for business purposes unrelated to this litigation. (*See, e.g.*, Dkt. Nos.

224, 343, 384, 468.)

Most recently, for example, Judge Docherty issued an Order on July 28, 2025 in which he

denied a motion to compel filed by TMS. (Dkt. No. 549.) In its motion to compel filed on May 21,

2025, TMS asked the Court to order Allen to produce documents showing a first authorized sale

of the Toyota parts that Allen sells. (Dkt. No. 449; *see also* Dkt. No. 451.) That same day, Allen

filed its motion to dismiss the Third Amended Complaint, which as explained, seeks to have this

Court weigh in on the proper scope of TMS's trademark claims. In Judge Docherty's July 28th

Order denying TMS's motion to compel, he first explained that in his previous decisions, "the

Court held that counterfeit parts are not at issue in this case" and "set strict limits on discovery into

Allen's supply chain." (Dkt. No. 549 at 4.) He then gave the following reasons for denying TMS's

motion to compel:

> The thrust of Allen's arguments in its briefing and at oral
> argument is that Toyota is judicially estopped from contesting
> Allen's assertion of the First Sale Doctrine because it conceded that
> the parts at issue are Gray Market Parts. That issue is currently
> before Judge Menendez on Allen's Motion to Dismiss, and this
> Court makes no determination about the extent to which Toyota's
> previous statements regarding Gray Market Parts bar it from
> challenging Allen's assertion of the First Sale Doctrine. This Court's
> decision on the issue before it on these motions is based solely on
> its previous determinations as to the scope of discovery in this case.

> To the extent necessary to decide the narrow question as to
> whether Toyota may pursue further discovery into Allen's supply
> chain in relation to Allen's assertion of the First Sale Doctrine as a
> defense against Toyota's claims, Toyota has failed to provide
> sufficient legal or factual grounds to support a decision overruling
> previous decisions of both this Court and Judge Menendez as to the
> scope of discovery in this case. Toyota may not seek further
> discovery into Allen's supply chain unless and until Judge
> Menendez's decision on Allen's Motion to Dismiss provides
> grounds for such inquiry.

(Dkt. No. 549 at 5.)

In objecting to that Order, TMS asserts that it: (1) improperly delays discovery due to a

pending motion to dismiss and effectively grants a stay on discovery without a finding of good

cause; (2) misapplies the definitions of gray market, counterfeit, and genuine, ignores the

allegations made by Toyota in its Third Amended Complaint related to the nature of the parts sold

by Allen, and ignores Allen's allegations in its Answer and Counterclaims; (3) fails to adequately

explain why the discovery is unwarranted given that the first sale doctrine is relevant to the case

and is still at issue; and (4) is based on the Court's denial of discovery into Allen's supply chain,

which itself improperly denies discovery. (Dkt. No. 568 at 1–2.) The Court finds nothing clearly

erroneous nor contrary to law in Judge Docherty's discovery order and, therefore, affirms his

decision. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. LR 72.2(a)(2). Indeed, Judge Docherty's rationale for his decision was imminently reasonable given the issues were pending in one form or another simultaneously before both Judges assigned to this case at the time he denied the motion to compel. The Court will not second-guess that reasonable approach to case management.

That said, this Court has now found that there is no judicial admission precluding TMS from litigating whether Allen acquired its parts through an authorized first sale. This Court has also determined that the allegations in the Third Amended Complaint plausibly allege that Allen's acquisition of Toyota parts occurred outside authorized channels. Precisely what impact these findings have on the proper scope of discovery, including TMS's efforts to obtain additional information concerning Allen's supply chain, should be determined, in the first instance, by Judge Docherty.

## III. Tortious Interference with Contract

Allen also seeks dismissal of TMS's claim that Allen tortiously interfered with TMS's existing contractual relationships (Count 4). To state such a claim, a plaintiff's complaint must establish five elements: (1) the existence of a contract; (2) that the defendant knew of the contract; (3) that the defendant intentionally procured the breach of that contract; (4) the defendant lacked a justification for procuring the breach; and (5) damages. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998); *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, 905 F.3d 1068, 1073 (8th Cir. 2018) (citing *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015)).

Allen argues that TMS fails to state a claim for tortious interference because TMS did not identify the contracts at issue. Allen contends that without specifying the contracts, TMS cannot plausibly allege several of the elements of a tortious-interference claim, including the existence of

a contract, Allen's knowledge of it, or Allen's intentional procurement of its breach. The Court disagrees.

While it is true that TMS has not specified each and every dealer agreement that is at issue under this claim, the Third Amended Complaint makes clear that TMS is alleging Allen intentionally procured breaches by TMS's authorized dealers of their respective dealer agreements with TMS. (TAC ¶¶ 102–03.) Further, TMS alleges that the Toyota Dealer Agreement and the Lexus Dealer Agreement both prohibit authorized dealers from buying gray market or non-genuine Toyota parts. (TAC ¶ 104.) TMS asserts that Allen was aware that the agreements include prohibitions on purchasing gray market parts, and Allen nonetheless solicited the authorized dealers to breach their contracts with TMS by purchasing parts from Allen. (TAC ¶ 104–07.) It is a reasonable inference that Allen knew about the dealer agreements based on TMS's demands that Allen cease and desist from importing non-genuine parts into the United States. (TAC ¶ 36.) Moreover, the Court observes that TMS is not free to include the specific dealer agreements that are at issue in its pleading because that information has been designated Attorneys' Eyes Only under the applicable Protective Order. This means that TMS's counsel in this litigation is not free to share with TMS information about which specific dealers Allen has dealt with. (Hr'g Tr. (Aug. 14, 2025) 61:10–62:5, Dkt. No. 570.)[13]

_____

[13] The parties disagree over whether Allen could have knowingly procured the breach of two versions of the dealer agreements, an earlier and a later version. Allen indicates that the initial dealer agreement, in fact, allowed Toyota dealers to use parts not purchased from TMS for non-warranty repairs, but TMS later updated the dealer agreements to prohibit the use of any non-TMS parts for any purpose. However, even if the initial dealer agreement allows authorized Toyota or Lexus dealers to use non-TMS parts for non-warranty repairs, the nature of Allen's interactions with specific dealers presents fact questions that cannot be resolved on a motion to dismiss under Rule 12(b)(6).

Allen next argues that if TMS's dealer agreements prohibit authorized dealers from purchasing Toyota parts from anyone other than TMS, that conflicts with public policy favoring competition as reflected in Minn. Stat. § 80E.07, subd. 1(b). Allen argues that this statute renders unenforceable any provision in a contract that would allow a distributor to terminate an agreement with a dealer because the dealer refuses to buy parts from only the manufacturer or the distributor. As a consequence, Allen argues that the contract is void and the tortious-interference claim should be dismissed because such a claim cannot be based on an unenforceable contract.

The Court is not persuaded that the tortious-interference claim should be dismissed on this basis. The statute reads as follows:

> Notwithstanding the terms of any franchise agreement or waiver to the contrary, the following examples represent circumstances which do not by themselves constitute good cause for the termination, cancellation, or nonrenewal of a franchise:
>
> ….
>
> (b) the fact that the new motor vehicle dealer refused to purchase or accept delivery of any new motor vehicle parts, accessories, or any other commodity or services not ordered by the new motor vehicle dealer, other than parts necessary to conduct recall campaigns or perform warranty service[.]

Minn. Stat. § 80E.07, subd. 1. This language does not say that a dealership agreement cannot be terminated because the dealer refuses to buy parts only from the manufacturer or the authorized distributor. Instead, the statute says that a dealer agreement cannot be terminated because the dealer refuses to buy or accept parts that the dealer did not order, except in cases of recalls or warranty repairs. This provision of Minnesota law does not require dismissal of Count 4.

## IV.  Unjust Enrichment

Allen also moves to dismiss TMS's unjust enrichment claim. (TAC, Count 5.) Under Minnesota law, the cause of action for unjust enrichment is an equitable one. *Hull v. ConvergeOne,*

*Inc.*, 570 F. Supp. 3d 681, 706 (D. Minn. 2021) ("An unjust enrichment claim sounds in equity . . . ."). A claim for unjust enrichment "is commonly referred to as a quasi-contract or a contract implied-in-law claim." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012), *superseded by statute on other grounds as stated in Hagen v. Steven Scott Mgmt., Inc.*, 963 N.W.2d 164, 169 (Minn. 2021) (citation omitted). To state a claim for unjust enrichment, TMS "must allege facts showing (1) a benefit conferred; (2) [Allen's] appreciation and knowing acceptance of the benefit; and (3) [Allen's] acceptance and retention of the benefit under such circumstances that it would be inequitable for [Allen] to retain it without paying for it." *Seuter v. Mead Johnson Nurition Co.*, 763 F. Supp. 3d 783, 796 (D. Minn. 2025) (citation omitted).

TMS claims that when an authorized Toyota or Lexus dealer makes a warranty repair, TMS must cover the cost of the labor and parts involved in the repair when the dealer uses TMS's Toyota parts. However, TMS has been forced to incur such costs for warranty repairs involving Allen's parts. According to TMS's pleading, it should not be required to pay for warranty repairs involving Allen's parts, and Allen should. TMS alleges that Allen sells Toyota-branded parts and fails to make the end-user (the Toyota customer) aware of the existence of Allen's own warranty for those parts. Allen also allegedly fails to provide reasonably accessible methods for those customers to find the terms of or file claims under Allen's warranty. So, according to the Third Amended Complaint, TMS is forced to pay for the costs of warranty repairs that ought to be borne by Allen. (*See* TAC ¶¶ 53, 59–60, 71–74.)

Allen argues that TMS's unjust enrichment claim fails because the Third Amended Complaint contains no allegations of implied-in-law or quasi-contractual relationship between TMS and Allen. Having considered the parties' briefing on this issue, Allen identifies no caselaw establishing that TMS's unjust enrichment claim cannot proceed. And based on the Court's own

27

research, the Court cannot say that TMS's claim fails as a matter of law at the pleading stage. Accordingly, the Court declines to dismiss TMS's unjust enrichment claim pursuant to Rule 12(b)(6).

It is true that TMS's claim lacks some of the hallmarks of a usual unjust enrichment claim. In traditional cases, an unjust enrichment claim is the properly available remedy because the parties failed to form an enforceable contract, but the plaintiff engaged in performance that directly benefited the defendant, and it would be unjust to allow the defendant to retain that benefit without making payment. *See, e.g.*, *Gaalswyk v. King*, No. 10-cv-411 (PJS/JSM), 2011 WL 4091858, at *14 (D. Minn. Aug. 2, 2011) (denying defendant's motion for summary judgment where the evidence would allow a jury to conclude that the plaintiff's work on litigation in Iowa benefitted the defendant, and whether the defendant retained that benefit of those services without paying for them), *R&R adopted by*, 2011 WL 4095990 (D. Minn. Sept. 14, 2011). TMS's unjust enrichment claim does not resemble that type of pre-existing quasi-contractual relationship between itself and Allen.

It is true that some cases find an unjust enrichment claim cannot go forward when there is no pre-existing contractual or quasi-contractual relationship between the plaintiff and defendant. *See e.g.*, *United States ex rel. Fesenmaier v. Cameron-Ehlen Gr., Inc.*, No. 13-cv-3003 (WMW/DTS), 2018 WL 11451362, at *7 (D. Minn. Oct. 22, 2018) (stating that "[a] plaintiff cannot maintain a claim for unjust enrichment if the plaintiff had no pre-existing contractual or quasi-contractual relationship with the defendant who is alleged to have been unjustly enriched" and dismissing the government's claim where it alleged only that there was a pre-existing relationship between the government and medical providers who billed Medicaid) (citation omitted); *Ventura v. Kyle*, 825 F.3d 876, 887 (8th Cir. 2016) (finding that the plaintiff could not

"maintain a claim for unjust enrichment because he had no pre-existing contractual or quasi-contractual relationship with" the defendant).

However, that result is by no means uniform. In an earlier case from this District, the plaintiffs asserted Lanham Act false endorsement claims against the defendant for using their likenesses in promotional materials for the defendant's gentlemen's club along with an unjust enrichment claim. *Moreland v. Kladeck, Inc.*, No. 21-cv-1975 (NEB/TNL), 2022 WL 1501122 (D. Minn. May 12, 2022). The defendant argued that the plaintiffs' unjust enrichment claim should be dismissed due to a lack of any quasi-contractual relationship. But the district court rejected that argument, explaining that the plaintiffs alleged they "conferred a benefit on [the defendant] because their misappropriated images and likenesses drove customers, business, and revenue to the [defendant's] club . . . [and] it would be morally wrong for [the defendant] to retain the benefit obtained from its misuse of Plaintiffs' images." *Id.* at *8 (internal quotations and citations omitted). Here, the essence of TMS's unjust enrichment claim is similar. TMS claims that Allen misused the Toyota Marks in a way that creates confusion for customers and authorized dealers and prevents discovery of whether a part used in a warranty repair is a TMS part. This allegedly causes customers and dealers to use Allen's parts in warranty repairs while wrongfully driving those warranty claims to TMS. Thus, TMS covers the costs for Allen's parts and labors in warranty repairs when those warranty claims should have been submitted to Allen. This is enough to plausibly allege a claim for unjust enrichment against Allen.

## V.     MDTPA and MUTPA

In Counts 6 and 7 of the Third Amended Complaint, TMS claims that Allen violated the

MDTPA[14] and the MUTPA.[15] A defendant violates the MDTPA when, in the course of business,

the defendant "causes likelihood of confusion or of misunderstanding as to the source, sponsorship,

approval, or certification of goods or services, causes likelihood of confusion or of

misunderstanding as to affiliation, connection, or association with, or certification by, another, or

engages in any conduct which similarly creates a likelihood of confusion or of misunderstanding."

*Jones v. Capella Univ.*, 706 F. Supp. 3d 822, 828 (D. Minn. 2020) (quoting Minn. Stat. § 325D.44,

subd. 1(2), (3), (13)) (internal quotation marks omitted). An MDTPA plaintiff is only entitled to

obtain injunctive relief, and only if the plaintiff alleges irreparable injury or the threat of future

harm. *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 677 (D. Minn. 2021); *see Boyd v. Target

Corp.*, 750 F. Supp. 3d 999, 1031 (D. Minn. 2024) (same). "Claims for deceptive trade practices

under Minnesota statute require the same analysis as claims under [the] federal Lanham Act."

*Rainbow Play Sys. v. GroundScape Techs., LLC*, 364 F. Supp. 2d 1026, 1039 (D. Minn. 2005).

In relevant part, the MUTPA provides that "[n]o person shall, in connection with the sale

of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or

origin of such merchandise." Minn. Stat. § 325D.13. The MUTPA provides that "[a]ny person

damaged or who is threatened with loss, damage, or injury by reason of a violation of [the

---

[14] TMS's MDTPA claim asserts that Allen has violated multiple provisions of Minn. Stat. § 325D.44, including subdivisions 2, 3, 4, 5, 13, and 14. (TAC ¶ 123.)

[15] In its MUTPA claim, TMS alleges that Allen has violated Minn. Stat. § 325D.13. (TAC ¶ 131.)

MUTPA's substantive provisions] shall be entitled to sue for . . . injunctive relief . . . and for the amount of the actual damages, if any." Minn. Stat. § 325D.15.[16]

Allen moves to dismiss both of these claims. As discussed below, the Court finds Allen's arguments unpersuasive and denies the motion to dismiss the MDTPA and MUTPA claims for failure to state a claim.

### A. Minnesota Residency or Injury

Allen first argues that both the MDTPA claim and the MUTPA claim should be dismissed because TMS is not a Minnesota resident and the complaint alleges no injury to TMS in Minnesota. Because TMS is not located in Minnesota, Allen asserts that the presumption against extraterritorial application of Minnesota laws prohibits its application to TMS, and Allen points to a line of cases that have dismissed MDTPA and MUTPA claims on similar grounds even when the defendant (like Allen) is located in Minnesota. (Def.'s Mem. 25–26.) The Court disagrees that dismissal is required under these circumstances.

It is true that there is a general presumption against extraterritorial application of Minnesota's statutes. *See Rouse v. H.B. Fuller Co.*, 694 F. Supp. 3d 1149, 1156–57 (D. Minn. 2023) (citing *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 961–62 (D. Minn. 2020)[17]). And courts in this District have dismissed claims under both the MDTPA and the

---

[16] One commentator has noted that "[t]here are very few cases interpreting and applying this act," and further opined that "the statute is meant to protect only consumers and not merchants," and "claims under this act will be analyzed similarly to false advertising claims under the Lanham Act." Michael K. Steenson et al., 27 Minn. Prac. Series, Prods. Liab. Law § 6.14, Unlawful Trade Pracs. Act (2024-2025 ed.).

[17] The discussion in *Johannessohn* cited by Allen in support of its argument involves a choice-of-law issue and analysis of the constitutionality of applying the Minnesota Consumer Fraud Act to claims asserted by out-of-state plaintiffs. 450 F. Supp. 3d at 961–63. The *Johannessohn* court found that out-of-state plaintiffs who purchased a Minnesota company's ATVs could not reasonably have expected Minnesota law to apply based only on the fact that the defendant manufacturer was based in Minnesota. *Id.* at 963.

MUTPA when plaintiffs asserting such claims failed to allege that they experienced any harm in Minnesota. *See, e.g.*, *id.*; *Ferrari v. Best Buy Co.*, No. 14-cv-2956 (MJD/FLN), 2015 WL 2242128, at *9–10 (D. Minn. May 12, 2015). In each of these cases, the individual consumer plaintiffs resided outside of Minnesota and purchased the defendants' products in other states for use there. *Rouse*, 694 F. Supp. 3d at 1156–57 (dismissing MDTPA and MUTPA claims of individual Washington and New Hampshire plaintiffs where they who purchased defendant's grout products out of state and installed in their residences); *Ferrari*, 2015 WL 2242128, at *9–10 (dismissing MDTPA and MUTPA claims of individual Massachusetts plaintiff who purchased products from Massachusetts store for use in Massachusetts).

TMS is a California corporation with its principal place of business in Plano, Texas. (TAC ¶ 2.) Like the plaintiffs in the cases cited by Allen, TMS does not "reside" in Minnesota, and one could certainly infer from TMS's complaint that Allen's conduct "injured" it in California or Texas. But the rationale of *Rouse* and *Ferrari* do not foreclose the possibility that TMS experienced harm in Minnesota. TMS's allegations support an inference that Allen makes at least some of its purportedly deceptive sales to TMS's authorized dealers and consumers in Minnesota. TMS also alleges that Allen's conduct damages TMS's reputation in Minnesota through those sales. Allen does not point to any case suggesting that, as a matter of law, such allegations are insufficient to support a claim that an out-of-state plaintiff suffered injury in Minnesota. Accordingly, taking the allegations in the complaint as true and the inferences from them in the light most favorable to TMS, the Court will not dismiss Counts 6 and 7 based on this argument at this stage.

### B.  MDTPA and Irreparable Harm

Next, Allen argues that TMS's MDTPA claim must be dismissed because TMS fails to allege any irreparable harm. (Def.'s Mem. 26–28.) Again, the Court finds otherwise.

As discussed above, the MDTPA only provides for injunctive relief, so a plaintiff's MDTPA claims will be dismissed if the plaintiff fails to allege irreparable harm. *See Cleveland*, 550 F. Supp. 3d at 677. To survive a motion to dismiss, a plaintiff must either allege that it has already experienced irreparable harm or that it will suffer such harm in the future. *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 890–91 (D. Minn. 2021). But allegations of speculative future harm are insufficient. *Id.* at 891 (finding the plaintiff's argument that he had alleged a threat of future irreparable harm was too speculative because he merely alleged uncertainty about whether a future purchase would suffer the same product defect "if he were 'to purchase another laptop from the Defendant'").

The Court finds that TMS plausibly alleges both the existence of irreparable harm and the threat of future irreparable harm. Specifically, TMS alleges that by selling Toyota branded parts that differ from TMS's so-called "genuine" Toyota parts, TMS has created consumer confusion about the affiliation of Allen's products with TMS. This interferes with TMS's ability to control the products associated with the Toyota Marks in TMS's territory and has caused harm to TMS's reputation and business goodwill. The Court expresses no opinion whether TMS is ultimately entitled to obtain any injunctive relief or will be able to establish that it suffers any irreparable harm, and it is entirely possible that Allen simply competes legitimately with TMS in the U.S.

market for Toyota-branded parts. But these allegations are sufficient to allow an MDTPA claim to survive a motion to dismiss for failure to state a claim.[18]

### C. MUTPA Claim by an Upstream Distributor

Finally, Allen argues that the Court should dismiss TMS's MUTPA claim because TMS is not a consumer, but an upstream distributor. Allen argues that TMS's claim is foreclosed by the Eighth Circuit's decision in *Marvin Lumber and Cedar Co. v. PPG Indus. Inc.*, 401 F.3d 901 (8th Cir. 2005) ("*Marvin II*"), which evaluated the import of the Minnesota Supreme Court's decision in *Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2 (Minn. 2001) on claims brought under Minnesota's consumer protection statutes. (Def.'s Mem. 28–29.)

Shortly before the decision in *Group Health*, the Eighth Circuit decided *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873 (8th Cir. 2000) ("*Marvin I*"). That case involved a dispute between Marvin, a manufacturer of wooden products like doors and windows, and PPG, a manufacturer and seller of coatings and other treatments for wood products. *Id.* at 875. Essentially, Marvin claimed that PPG had misrepresented the nature and effectiveness of its treatment products in preventing wood rot and deterioration, which caused Marvin's windows and doors to fail. *Id.* In *Marvin I*, the court explained that, along with other statutes like the MCFA, the MUTPA is "designed to protect consumers." *Id.* at 887 (citation omitted). Because the plaintiff in *Marvin I* was a sophisticated party that qualified as a "merchant" under the Uniform Commercial

---

[18] TMS also suggests that it has pled irreparable harm because it has been required to pay for warranty repairs performed by its authorized dealers when they use Allen's parts. The Court finds it is unnecessary to determine whether this aspect of TMS's claim support any inference of irreparable harm because the complaint otherwise satisfies the irreparable-harm MDTPA pleading requirement. However, the Court notes that the most obvious inference from these allegations is that TMS has had to pay money for warranty repairs that it shouldn't, and that is certainly compensable through monetary damages. Whether there is any other aspect of those claims that could entitle TMS to injunctive relief, the Court leaves for another day.

Code with respect to the business transaction at issue, the court affirmed the district court's dismissal of the Minnesota statutory claims. *Id.* at 887–88.

In *Group Health*, the Minnesota Supreme Court was asked to resolve questions of Minnesota law about the requirements for pleading and proving claims under Minnesota consumer protection statutes, including the Minnesota Consumer Fraud Act and the MUTPA. 621 N.W.2d at 4. Most relevant here, the *Group Health* court was asked to resolve whether "a private plaintiff [must] be a purchaser of the defendants' products in order to plead a claim under Minnesota's misrepresentation in sales statutes . . . ." *Id.* The Court concluded that a plaintiff is not required to be a direct purchaser. *Id.* The plaintiffs were health maintenance organizations ("HMOs") that asserted claims against cigarette manufacturers under the MCFA, the MUTPA, and other Minnesota statutes, "seeking to recover costs of increased health-care services incurred as a result of their members' tobacco-related illnesses." *Id.* at 4–5. The *Group Health* court found that the "HMOs need not be actual purchasers of the tobacco companies' products in order to properly plead claims under" the MUTPA and other cited provisions. *Id.* at 11.

Three years after the Minnesota Supreme Court decided *Group Health*, the Eighth Circuit rejected a reading of the *Group Health* decision that would allow a seller to bring a claim under the MCFA. *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 493 n.12 (8th Cir. 2004). In *Popp Telecom*, the court explained that "[a]lthough the Minnesota Supreme Court held that a plaintiff need not be a purchaser of the defendant's products in order to properly plead a claim under the CFA, . . . the case involved plaintiffs who were, in effect, indirect consumers of the defendant's products, not sellers." *Id.* (citing *Group Health*, 621 N.W.2d at 4–5).

After *Popp Telecom*, the Eighth Circuit revisited these issues in *Marvin II* after the remand from *Marvin I*. Because *Group Health* was decided after the *Marvin I* court had affirmed the

35

dismissal of Marvin's statutory claims, and *Group Health* had held that a plaintiff need not be a purchaser to bring a claim under statutes like the MUTPA, Marvin argued that its statutory claims should be reinstated. *Marvin II*, 410 F.3d at 920. The *Marvin II* court held that *Group Health* did nothing to undermine its earlier conclusion that Marvin's "statutory claims did not survive dismissal because Marvin is a merchant, not a consumer" and observed that "[i]n *Group Health*, no merchants were involved." *Id.* The *Marvin II* court further explained that "[i]f the Minnesota Supreme Court thought we got it wrong in *Marvin I*, one would expect that the court would have mentioned it in its opinion in *Group Health* four months later . . . ." *Id.* Because the *Group Health* decision did not contradict *Marvin I*, the court in *Marvin II* reaffirmed its prior decision. *Id.* And the *Marvin II* court noted that in *Popp Telecom* it had distinguished *Group Health* because the plaintiff HMOs "were, in effect, indirect consumers of the defendant's products." *Id.* (citing *Popp Telecom*, 361 F.3d at 493 n.12).

Here, of course, TMS does not claim that it is a purchaser of Allen's products. But that does not foreclose its claims under the *Group Health* decision because the Minnesota Supreme Court held that the MUTPA and other consumer-protection statutes at issue did not require the plaintiff to be a purchaser. When viewing TMS's pleading in the most favorable light, the Court finds that TMS has alleged that it is an indirect purchaser akin to the HMOs in *Group Health*. The Court does not read the Eight Circuit's decisions in *Marvin I*, *Marvin II*, or *Popp Telecom* as foreclosing TMS's claim. If anything, to the extent they are instructive in this context, those decisions have emphasized the indirect-purchaser status of the HMOs in *Group Health* as an important consideration in determining whether a party can be a plaintiff under the relevant Minnesota misrepresentation-in-sales laws. Accordingly, the Court concludes that TMS's claim

should not be dismissed based on Allen's argument that TMS failed to allege it is an indirect purchaser.

## ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1.    Defendant's Partial Motion to Dismiss the Third Amended Complaint (Dkt. No. 456) is **DENIED**.

2.    Plaintiff's Objection (Dkt. No. 568) is **OVERRULED** and the discovery Order dated July 28, 2025 (Dkt. No. 549) is **AFFIRMED**.

Date: September 30, 2025                      *s/Katherine Menendez*
                                              Katherine Menendez
                                              United States District Judge